STATE

v.

Wesley HANES.

No. 2000–168–C.A.

Supreme Court of Rhode Island.

Nov. 2, 2001.

Annie Goldberg, Providence, for Plaintiff.

Janice M. Weisfeld, Paula Lynch Hardiman, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The defendant, Wesley Hanes, has appealed from a judgment of conviction of first-degree murder and carrying a handgun without a license in the fatal shooting of Jamel Palmer. The defendant argued that the trial justice erred: (1) by failing to instruct the jury correctly on the use of deadly force in self-defense, and (2) by refusing to permit defense counsel to elicit testimony during cross-examination of the medical examiner that, based on the trajectory of the bullet, Jamel was leaning over and reaching for his back pocket at

the time he was shot. For the following reasons, we affirm the judgment of the Superior Court.

### Facts and Procedural History

On the evening of June 21, 1998, in celebration of his twenty-seventh birthday, defendant attended a concert at Lupo's Heartbreak Hotel (Lupo's), a nightclub in downtown Providence. By the time defendant, accompanied by his friend, James Long (Long), arrived at the nightclub, defendant already had been drinking alcohol for about ten hours. Also in attendance at the concert that night were two brothers, Eric Palmer (Eric) and Jamel Palmer (Jamel or victim), and their cousin, Ronald Wilson (Wilson).

As a large crowd of patrons left Lupo's at approximately 1 a.m. the following morning, defendant became embroiled in a confrontation with Eric and Jamel that ended when defendant fired a gun at Jamel, fatally wounding him. The defendant later was arrested, and a grand jury indicted him for murder, in violation of G.L. 1956 § 11–23–1; for carrying a handgun without a license, in violation of G.L.1956 § 11–47–8; and for resisting arrest, in violation of G.L.1956 § 12–7–10.

At trial, the state's witnesses and defendant presented various, conflicting accounts of the deadly encounter between defendant and Jamel. Of particular relevance to this appeal was Eric's testimony that the confrontation began when defendant and two companions "bumped into" him and his brother. In contrast, defendant testified that it was Jamel who "bumped into" defendant and thereby provoked the ensuing conflict.

The defendant further testified that the conflict escalated when Eric told defendant that he and his brother were carrying "burners" or guns and threatened to "wet him up" or shoot him. Long corroborated

that Eric was shouting, "We got guns." According to defendant, he then stepped backwards and leaned against a wall. Some time later, defendant alleged, Jamel began to approach him aggressively, reaching for something behind his back and saying, "How you want to handle this?" Fearing that Jamel was reaching for a gun, defendant testified, he drew his own gun and fired in self-defense.

Eric, on the other hand, denied that his brother was moving toward defendant when defendant reached for his gun. Rather, he testified that after the "argument" between Jamel and defendant had ended, "some girl," who was not identified or interviewed by police, said to defendant, "You going to let them punk you off like that?," at which point defendant shot Jamel. Eric denied telling defendant that he and his brother were carrying guns, and no guns were found on either Eric or Jamel. Eric did testify that, following the shooting, he took off his shirt and chased defendant briefly before returning to his brother. Eric then ran through an alley on the way to his car, leading the defense to theorize that Eric disposed of a gun during that time. Monique Crowell, the sister of defendant's girlfriend, testified that she saw defendant come up from behind Jamel and shoot him with no confrontation at all. Finally, Wilson answered, "I don't remember that," when asked whether Eric and Jamel told defendant that "they had burners and they were going to wet [defendant] up."

At the close of the state's case, the trial justice entered a judgment of acquittal on the third count in the indictment, resisting arrest. The trial proceeded on the first two counts, and a jury found defendant guilty of first-degree murder and carrying a handgun without a license. On December 6, 1999, defendant was sentenced to the mandatory term of life in prison for

the murder and to a consecutive term of five years on the handgun charge. The defendant appealed. Additional facts will be provided as needed in discussing the issues raised by this appeal.

### Instructions to the Jury

The defendant argued on appeal that the trial justice erred by refusing to instruct the jury that if it found that defendant provoked a non-deadly confrontation with Jamel, and Jamel responded with apparent deadly force, then defendant was entitled to use deadly force in self-defense. In particular, defendant objected to the trial justice's instruction that, "Wesley Hanes was not permitted to rely on self-defense if he had provoked the deadly confrontation."

During trial, both the state and the defense submitted requests for jury instructions. The state made a total of thirty-eight requests, seven of which specifically concerned self-defense. The defense submitted eighteen requests, nine under the heading "AS TO SELF DEFENSE." The state sought an instruction on self-defense that "[o]ne may not invoke the doctrine of self-defense if he has instigated the combative confrontation," citing this Court's opinions in *State v. Guillemet*, 430 A.2d 1066 (R.I.1981), and *State v. Lamoureux*, 573 A.2d 1176 (R.I.1990). None of the defense's proposed instructions addressed the issue of whether an aggressor has the right to self-defense.

The trial justice discussed the requests with both parties before charging the jury. At one point in the discussion, the trial justice indicated that he intended to charge the jury in accordance with the state's instructions on self-defense, although not necessarily using the state's wording. The trial justice then turned to the instructions on self-defense that the defense sought and agreed to "cover" all instructions but one, which did not concern the issue of an aggressor's right to self-defense.

The trial justice proceeded to charge the jury and subsequently invited both parties to make objections at sidebar. At that point, the defense raised a number of objections,[1] including the one now being pressed on appeal. More specifically, defense counsel stated:

"I object to your instruction when you instructed the jury if you find the defendant provoked the confrontation he can't use self-defense. And I believe there is case law that indicates even if the defendant provokes a confrontation, if confrontation turns to such degree that a person is required to defend themselves that the person can defend on self-defense. And I would ask the Court to give that further instruction."

A short colloquy on the subject ensued, and the trial justice declined to give further instruction on that point.[2] The judge

---

1. The defense's objections at sidebar included a renewed request for an instruction on the doctrine of "imperfect self-defense." *See State v. Catalano*, 750 A.2d 426, 429–30 (R.I. 2000) (discussing and rejecting the doctrine). The defense did not raise the issue in its brief on appeal or during oral argument, and therefore, we do not address it here.

2. The following exchange occurred between the trial justice and defense counsel:
   "THE COURT: Okay. That if—if defendant provoked confrontation—are you sure

about that? Even if he provokes the confrontation that resulted in death?
"[DEFENSE COUNSEL:] If he provoked a confrontation.
"THE COURT: That resulted in death?
"[DEFENSE COUNSEL:] If on confrontation at some point in the events in the confrontation it turns to such that he is required to act in self-defense, a person may act in self-defense.
"THE COURT: That is a new confrontation.
"[DEFENSE COUNSEL:] Not necessarily.

did agree, based on defense counsel's objections, to give supplemental instructions on certain other aspects of self-defense, the pertinent portion of which is discussed *post.* Neither party objected following the supplemental charge.

■ As a preliminary matter, we observe that the defendant's objection was properly preserved for appeal. Under Rule 30 of the Superior Court Rules of Criminal Procedure, "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." The purpose of the rule is to ensure that the trial justice is alerted to any deficiencies in the charge while there is still an opportunity for cure. *See State v. Parker,* 472 A.2d 1206, 1210 (R.I.1984).

■ The state has argued on appeal that because the defense did not renew its objection to the jury instructions following the supplemental charge, it failed to preserve the objection. However, at the time the defense made its objection, the trial justice specifically declined to give further instruction on that issue. Nothing in the supplemental charge addressed the alleged defect that defense counsel noted, see *post,* and the trial justice had no reason to believe that the alleged error had been cured. Under these circumstances, it is our opinion that defense counsel's objec-

tion to the original charge was sufficient to preserve the issue for review. We therefore turn to the merits of defendant's claim.

On appeal, defendant has contested but one sentence of a jury charge that spanned over twenty pages in the trial transcript. With respect to self-defense, the trial judge instructed:

"Now third, the evidence must prove beyond a reasonable doubt that the killing was unlawful. In other words, the evidence must prove beyond a reasonable doubt that the defendant had no justification in the law under all the circumstances to have intentionally killed Jamel Palmer. So that, in this case the evidence must prove beyond a reasonable doubt that Wesley Hanes was not justifiably defending himself when he intentionally killed Jamel Palmer.

"The defendant is permitted to use deadly force to defend himself, if he reasonably believed at the time that he was threatened with imminent death or serious bodily injury, which he could avoid or prevent only by the use of deadly force. He was not required to wait for another to strike the first blow to hit at him. He was permitted to use only that degree of force which was reasonable to defend himself against the harm which he could reasonably foresee under all the circumstances. He was

"THE COURT: I'm not going to give it. I see exactly—there is nothing here to show that the confrontation—the deadly confrontation which I referred to was—could have been provoked by Jamel. Go ahead.
"[DEFENSE COUNSEL:] If the jury comes to believe that the provocation for this entire incident occurred with a bump, which obviously the bump is not a—
"THE COURT: That is not deadly.
"[DEFENSE COUNSEL:] That is not deadly.

"THE COURT: You are not arguing that you can respond to a bump by shooting a person to death. That is why I'm having trouble. Because, I think you are in Alice in Wonderland. That you can respond to being bumped by shooting a person to death. I hope not.
"[DEFENSE COUNSEL:] I didn't say that.
"THE COURT: I know you didn't. But, that is a clear implication from that charge, and for that reason I decline to give it. Okay."

not permitted to use excessive force. Wesley Hanes was permitted to use deadly force, if no reasonably safe avenue of retreat appeared then to be available to him. *Wesley Hanes was not permitted to rely on self-defense if he had provoked the deadly confrontation.*

"As you come to consider the question of whether or not the defendant was justifiably defending himself when he killed Jamel Palmer, you should consider all the circumstances at the time of the killing, including the conduct and bearing of all the persons who were present, the general atmosphere and how those circumstances reasonably appeared to the defendant at the time." (Emphasis added.)

In addition, the judge gave a supplemental charge, which included the following instructions with respect to self-defense:

"First, I have told you that the second,—the third element of the crime of murder and of the crime of voluntary manslaughter was that the killing was unlawful and not justified as self-defense. I also told you that the burden was on the State to prove all the elements by evidence beyond a reasonable doubt. That means that in order for you to find the defendant guilty of murder or of manslaughter, you must find that the State has satisfied you by evidence beyond a reasonable doubt that the defendant was not justified in defending himself. So that, if the state has not satisfied you by evidence beyond a reasonable doubt that the defendant was not justified in using deadly force to defend himself, your verdict must be not guilty on Count I, not guilty of any crime.

"Now, I told you when I charged you that the defendant was permitted to use deadly force, only if no reasonable avenue of retreat, that is space, place and time to run away, appeared then·to be reasonably available to him. That means that the converse is true. That, he will be justified in using deadly force to prevent or avoid the use of deadly—a reasonably credible threat of deadly force against him and he will be entitled to stand his ground, in other words, if there is no reasonable way for him to run away to avoid the confrontation and there is a reasonably credible threat of imminent deadly force against him, he can stand his ground and use deadly force in response to that threat of imminent death or body [*sic*] harm."

■ We have consistently held that a trial justice's instructions to a jury "need only 'adequately cover [ ] the law.' " *State v. Marini,* 638 A.2d 507, 517 (R.I.1994) (quoting *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990)). On review, " '[w]e will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered,' " *Marini,* 638 A.2d at 517, in order to ascertain the manner in which a jury composed of ordinary, intelligent lay people would have understood them. *Id.; see also State v. Perry,* 770 A.2d 882, 886 (R.I.2001).

After reviewing the challenged portion of the instructions in context, we are of the opinion that the trial justice adequately covered the law of self-defense. First, the trial justice properly placed the burden on the state to prove beyond a reasonable doubt that defendant did not act in self-defense when he killed Jamel, an instruction that was reinforced by the supplemental charge. Second, the trial justice accurately summarized the circumstances under which defendant was entitled to defend himself with deadly force, explaining that defendant must have a reasonable fear of "imminent death or serious bodily injury" and must respond reasonably in proportion to that threat,

retreating if it is reasonably safe to do so. The supplemental charge also addressed this issue, stressing that defendant was entitled to stand his ground if he had "no reasonable way" to avoid the confrontation. The trial justice pointed out that although defendant "was not required to wait for another to strike the first blow," he was not entitled to rely on self-defense "if he had provoked the deadly confrontation." Finally, the trial justice urged jurors to "consider all the circumstances" when reaching a conclusion on the issue of self-defense.

■ We are persuaded that a reasonable juror, upon hearing these instructions, would not have believed that a verdict of not guilty by reason of self-defense was precluded if the jury found defendant's only responsibility for the entire encounter was a "bump," unaccompanied by any intent or effort to escalate the confrontation to a deadly level or to provoke "the deadly confrontation." Therefore, we conclude that the trial justice committed no error in instructing the jury as he did. Taken as a whole, the jury instructions sufficiently covered the applicable law of self-defense.

### Testimony of the Medical Examiner

■ The second issue raised by defendant on appeal was that the trial justice erred by not allowing the medical examiner to testify on whether the trajectory of the bullet was consistent with the victim leaning over and reaching for his back pocket.

At trial, the state offered the expert testimony of Elizabeth Laposata, M.D. (Dr. Laposata), chief medical examiner for the State of Rhode Island. On direct examination, Dr. Laposata testified that her autopsy of the victim revealed that the bullet entered the victim's body below the left collarbone, traveled through the ribs into the left lung and through the aorta,

finally coming to rest to the left of the spinal column at the midline of the chest. In other words, Dr. Laposata testified, "The trajectory through Mr. Palmer was from his front to his back, his left to his right, and downward at approximately 75 degrees." On the basis of this information, Dr. Laposata went on to testify that if the gun was fired directly at Jamel, he would have been bent at the waist and turned slightly to the right when he was shot. On cross-examination by defense counsel, the following exchange occurred:

"Q So it had—from the top of his body to down his body, it had somewhat of a down trajectory?

"A Yes. I described it as downward at about 75 degrees.

"Q You stated that the position, that if the gun were directly at him that he would be in a position somewhat leaning like, so the bullet came through the top part of his body and traveled down in a direction like this (indicating)?

"A Yes.

"Q Sort of leaning over putting his hand toward his back pocket, correct?

"[THE STATE]: Objection.

"THE COURT: Sustained. Witness will not answer. Jury will disregard the question."

After the state's objection was sustained, defense counsel began a new line of questioning on the toxicology studies that Dr. Laposata performed on Jamel.

■ It is amply clear that defendant failed to preserve for appeal the question of whether the medical examiner should have been permitted to respond to defendant's question. It is well settled that an issue may not be considered on appeal, unless it has been "preserved at trial by a specific objection, sufficiently focused so as

to call the trial justice's attention to the basis for said objection." *State v. Warren,* 624 A.2d 841, 842 (R.I.1993); *see also State v. Pacheco,* 763 A.2d 971, 976 (R.I.2001); *State v. Bettencourt,* 723 A.2d 1101, 1107 (R.I.1999); *State v. Toole,* 640 A.2d 965, 972–73 (R.I.1994).

Here, after the trial justice sustained the state's objection, defense counsel abandoned its line of questioning with respect to the trajectory of the bullet. Furthermore, as was the case in *State v. Johnson,* 667 A.2d 523, 530 (R.I.1995), "[defense counsel] made no offer of proof, nor did he articulate any rationale for allowing [the witness] to respond to the question, nor did he attempt to rephrase the question." Thus, our conclusion in *Johnson* is equally applicable here, namely, "we need not reach the merits of defendant's claim." *Id.*

■ But, even if the objection had been properly preserved, we would not disturb the trial justice's ruling. We review a trial justice's decision to exclude expert testimony by an abuse of discretion standard. *State v. Collins,* 679 A.2d 862, 867 (R.I. 1996). Here defense counsel did not ask Dr. Laposata if the trajectory of the bullet was *consistent* with a particular position of the victim's arm. Rather, the defense asked Dr. Laposata whether, based on the bullet's trajectory, the victim *"would be* in a position somewhat leaning like, so the bullet came through the top part of his body and traveled down in a direction like this (indicating)." (Emphasis added.) Doctor Laposata responded in the affirmative, and defense counsel immediately asked, "Sort of leaning over putting his hand toward his back pocket, correct?" An affirmative answer to that question would have implied that, based on the bullet's trajectory, the victim *would be* leaning over putting his hand toward his back pocket, not simply that the trajectory was *consistent* with such a conclusion. On this point, we agree with the state that "nothing in the evidence developed postmortem could have enabled 'the unbiased medical expert' to determine what, if anything, the victim was doing with his right arm at the moment he was shot."

■ "Unquestionably, an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion." *DeChristofaro v. Machala,* 685 A.2d 258, 267 (R.I.1996) (quoting *Alterio v. Biltmore Construction Corp.,* 119 R.I. 307, 312, 377 A.2d 237, 240 (1977)). Under Rule 705 of the Rhode Island Rules of Evidence, such facts must be disclosed before an expert gives an opinion, "otherwise it is impossible to assess whether the conclusions drawn from the facts possess sufficient probative force or, rather, are grounded in mere speculation or conjecture." *Id.* at 267 (citing *Alterio,* 119 R.I. at 313, 377 A.2d at 240).

In the instant case, the facts set forth in the record did not provide a basis for Dr. Laposata to determine what Jamel was doing or would have been doing with his arm when he was shot, and any such testimony on her part would have been pure speculation and conjecture. Consequently, the trial justice did not abuse his discretion in disallowing the question.

### Conclusion

In summary, therefore, we deny and dismiss the defendant's appeal, and we affirm the judgment of the Superior Court, to which the papers of the case may be returned.