STATE

v.

Anthony **FELICIANO**.

No. 2002–624–C.A.

Supreme Court of Rhode Island.

July 14, 2006.

Virginia M. McGinn, Esq., Providence, for Plaintiff.

Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

A jury convicted the defendant, Anthony Feliciano, of several offenses in connection with the shooting death of Walter Sol and the wounding of Juan Palomo. The defendant now appeals from the five-count conviction in Superior Court, which counts were as follows: count 1, conspiracy to commit murder; count 2, first-degree murder; count 3, assault with intent to commit murder; count 4, discharging a firearm while committing a crime of violence, resulting in death; and count 5, discharging a firearm while committing a crime of violence, causing injury.[1] On counts 2 and 4, the defendant was sentenced to two mandatory consecutive life sentences. In addition, he was sentenced to ten years to serve for conspiracy (count 1), to run concurrently with count 2, and to twenty years suspended with probation for the crimes against Palomo (counts 3 and 5) to run concurrently with count 4.

On appeal, defendant advances four arguments that, individually, he posits should result in the reversal of his conviction. The first three allegations of error are evidentiary. The defendant's foremost contention is that an opinion of the United States Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), compels this Court to reevaluate past precedents maintaining the admissibility of hearsay evidence, under certain circumstances, against criminal defendants pursuant to Rule 804(c) of the Rhode Island Rules of Evidence. Specifi-

---

1. The indictment also charged the defendant with two counts (6 and 7) of carrying a firearm without a license, which counts the state dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

cally, he asserts that the trial justice erred by admitting a statement Sol made to an acquaintance days before his death. Next, defendant argues that the trial justice abused his discretion by allowing the state's assistant medical examiner to answer a series of hypothetical questions, when the record lacked adequate foundation to support them, and when the witness's answers served only to mislead the jury. In the last of his evidentiary challenges, defendant asserts that the trial justice further abused his discretion by permitting a detective to testify about a conversation between a Spanish-speaking police officer serving as a translator and the surviving victim, Palomo, concerning the latter's photo identification of coconspirator Jesse Simas.[2] As his final claim, defendant urges this Court to overturn our holding in State v. Rodriguez, 822 A.2d 894, 906–08 (R.I.2003), and hold that his simultaneous convictions for murder and discharging a firearm in connection with that murder violate the protection against double jeopardy contained in article 1, section 7, of the Rhode Island Constitution.

By nature of his timely appeal, we address defendant's arguments seriatim in Part II of this opinion, and, based on the reasons therein, affirm the judgment of conviction.

# I

## Facts and Procedural History

For Walter Sol, the evening of June 16, 2001, began with revelry and libations at a park on Valley Street in Providence. Marvin Torres, who was under a sentence of home confinement on the evening in question, testified that he arrived at the park in his Honda Civic, shedding his ankle bracelet for the occasion. Already present were friends Jorge Benitez, Palomo, and Sol. Drinking until the point of dizziness, the group decided to depart the park around 11:30 p.m. and proceed to "Jennifer's house," which was apparently located on Bergen Street, the site of the approaching incident.

Although the timing and logistics of the jaunt to Bergen Street are somewhat in dispute, it is clear that the group departed the park in two vehicles: Torres's Honda and a stolen Toyota Camry. When they arrived at Bergen Street around midnight, Torres was driving the Toyota with Palomo in the passenger seat, followed by Benitez and Sol in the Honda. As Torres slowly began to drive the Toyota down Bergen Street in the direction of Regent Avenue, "[s]ome dude," whom Torres described as a "[w]hite" person, walked into the middle of Bergen Street brandishing a firearm. Upon seeing the exposed weapon, Torres accelerated, narrowly missing the gun-wielding assailant, but not before a bullet penetrated the windshield and struck passenger Palomo in the left arm, directly above the elbow. Palomo later described the individual as an "American," and when pressed further, indicated that he was a "[w]hite * * * American." Torres continued speedily down Bergen Street, made a right turn onto Regent Avenue, and, with an injured Palomo in tow, fled the scene. Although Torres was unable to identify the shooter during the ensuing investigation, Det. Philip Hartnett testified that Palomo picked the "person who shot at the car" out of a police photo array, which individual the police identified as Jesse Simas, a reputed drug dealer in the neighborhood.

Benitez, from his perspective behind the Toyota, testified that the shooter redirected his ire toward him and Sol, driver and

2. Jesse Simas was charged in the indictment as a codefendant of Feliciano. Before the trial, however, Simas pled guilty to counts 1, 3, 5, and 6 of the indictment.

front-seat passenger in the Honda, respectively. As the gunman fired, Benitez ran him over with the vehicle, crashed into another car, hit his head on the windshield, and briefly passed out. When Benitez recovered consciousness, he got out of the vehicle from the driver's side door and ran in the direction of Regent Avenue. Alfred Rotondo and his cousin Alfred Conte, Jr., both living at 60 Bergen Street at the time, largely confirmed Benitez's account of that evening's events. Rotondo testified that, as he was watching television in his bedroom, he was startled by a loud "smash," which the witness likened to the sound of an automobile collision. Running to the front parlor, the four bay windows of which boasted a wide vista of brightly lit Bergen Street, Rotondo observed an individual whose buttocks were lodged in the passenger side of the Honda's windshield. Conte, who was standing beside his cousin in the parlor as the events unfolded before them, added that an individual, whom Conte described as "[k]ind of big, kind of heavy, [and] white," was shouting for someone to extricate him from the windshield. The Honda's occupants complied and defenestrated the individual, who then ran bleeding toward 59 Bergen Street.

Immediately after that, Rotondo recalled seeing three men walk over to the Honda from between 61 and 59 Bergen Street—across the street from the witnesses' even-numbered street address. Rotondo then observed one person, whom he described as a skinny young black man with dreadlocks, approach the passenger-side window, and, with a gun in his left hand, fire five shots at close range into the vehicle. The gunman then walked away from the Honda and disappeared between 61 and 59 Bergen Street, while the Hon-

da's passenger, apparently wounded during the melee, managed to get out of the vehicle. Upon leaving the Honda, Rotondo saw the man fall to the ground initially, but then scamper away northward on Bergen Street. Conte provided a similar description of the gunman, but testified to hearing only four shots and seeing only one person approach the Honda. During the subsequent investigation, both witnesses identified defendant, Anthony Feliciano, as the man who riddled the Honda with bullets.

Officer Lucio Andreozzi arrived a short time later, and, with his flashlight, observed the man who had been shot, later identified as Sol, lying prostrate on the ground behind 48 Bergen Street. After a rescue arrived to rush Sol to the hospital, Officer Andreozzi, with another officer, followed a trail of bloodstains from the scene of the collision into 59 Bergen Street. The bloodstains led the officers into a bedroom on the third floor, where they found an excited and injured Simas, who, being tended by his sister, said, "I got hit by a car." Although Simas initially refused medical attention, he eventually was taken to the hospital. Officer Andreozzi then rendezvoused back on Bergen Street with Det. Edward Clift of the Bureau of Criminal Identification to secure the crime scene and gather evidence, which ultimately included a jammed 9mm semiautomatic handgun found in a trash can and several expended bullet casings in the proximity of the Honda.

The state also presented the deposition testimony of James Arnold, who said that he witnessed not only the shooting, but also the initiation of the conspiracy.[3] Ar-

---

**3.** Arnold was hospitalized and unavailable to testify in court during trial. With the court's permission, counsel for the state deposed Arnold in the hospital on the afternoon of February 4, 2002, and, because the seriousness of the witness's infirmity prevented a complete deposition that day, again on the morning of February 5, 2002. Defense counsel was pres-

nold testified that on the morning of the murder he was doing maintenance work on a vehicle's brakes in the driveway between 59 and 61 Bergen Street for a man not otherwise implicated in these events. In the backyard several feet away from the car, Arnold saw Feliciano and Simas "[s]moking a blunt." Within a short time, two people the witness described as "Spanish males" approached Feliciano and Simas, walking past the preoccupied but observant Arnold in the process. At that point, according to Arnold, "[t]he other Spanish kid walked away and the other Spanish kid asked how much to cap the Guatemalan." Arnold later identified from a police photo array the inquiring "Spanish kid" as Angel Rivera, a man implicated in but never charged in connection with these events. In response to Rivera's question, either Feliciano or Simas, or both, answered "a G," which apparently is the vernacular for $1,000. Rivera then walked away. In the meantime, Feliciano and Simas moved to some benches on the side of one of the houses, but still only several feet from Arnold, who continued working on the vehicle. Arnold testified that Rivera soon returned, produced a sum of cash in small bills, which defendant and Simas counted in Rivera's presence, and tendered a handgun to Feliciano and another one to Simas, who then veiled the weapons in the waistbands of their respective pants. Rivera, Feliciano, and Simas then left, and, finishing up, Arnold left the area thirty to forty-five minutes later.

Arnold testified that he returned no later than 11 p.m. on that day to collect the rest of his fee for the brake work from the vehicle's owner, who had not yet arrived to meet him. While Arnold was waiting,

Norma Iris Castro, a resident of 59 Bergen Street affectionately known as "Ma," invited him into her house because, as Arnold said, "it was hot around that area with cops." Castro, who testified for the defense at trial, disputed the proffer of an invitation and even Arnold's presence in the residence that evening. Nevertheless, Arnold testified that from a window at 59 Bergen Street he observed the following:

"A car driving down the street and Jesse Simas continues to walk out of the driveway to the street and the car stops and they—I don't know what they said but they said something to Jesse and Jesse pulls out a gun and says, this is what I'm going to do and starts firing and the car takes off and hits him. Jessie goes up in the air and lands down on the car.

"* * *

"Once the car hit him and hit the other car, he flew off. He started hobbling away back into the driveway of 59/61 and that is when Ant Feliciano came running out and said, I'm going to [expletive deleted] kill this mother [expletive deleted], fired and then ran up to the car and fired into the car."

In answer to subsequent questions, Arnold testified that Feliciano fired two or three shots into the passenger-side window of the Honda and then ran away between two houses. A short time later, according to Arnold, Feliciano reappeared in the street, jumped into a gray station wagon, and drove off. Arnold, too, departed, leaving Castro's house and jumping over a fence in the backyard. The witness later identified Rivera, Simas, and Feliciano from police photo arrays.

---

ent throughout the entire deposition, and cross-examined the witness extensively. The transcript of the deposition was read aloud to the jury less a number of stipulated redac- tions, marked as an exhibit, and placed in the record, all without objection from defense counsel.

Testifying at trial, defendant said that he was inside 61 Bergen Street replenishing his supply of illegal drugs at the time of the shooting. According to defendant, after hearing the ruckus outside, he ventured onto Bergen Street only to witness the scattering of various people presumably involved in the incident. Although defendant said that he could not identify the perpetrator because he did not witness the event as it occurred, relatives and friends testifying on his behalf implicated Joseph Hall, defendant's acquaintance known as "Nuts." According to defendant, he quickly reentered the house, retrieved his stash of drugs, and fled the scene in a vehicle with Nuts and company.

Walter Sol was pronounced dead on Sunday, June 17, 2001, at 8:15 a.m. A postmortem X-ray indicated the presence of a metallic projectile in the left side of the decedent's lower abdomen. A subsequent autopsy revealed a gunshot entrance wound on the right side of the frontal lower abdomen. Jennifer Swartz, M.D., who conducted the autopsy, determined that the cause of death was bleeding from injuries to the large and small bowel and iliac blood vessel.

After the trial, the jury returned verdicts of guilty on the five remaining counts of the criminal indictment. On February 15, 2002, the trial justice heard and denied defendant's motion for a new trial, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The defendant was sentenced on February 7, 2002, after which he timely appealed.

## II

### Discussion

We divide our discussion into four parts, corresponding with defendant's four assignments of error, with respect to which additional facts will be supplied as warranted.

### A. Declaration of Decedent Made in Good Faith

■ The purported hearsay testimony of the decedent, reiterated at trial by one of his confidants, is the focus of defendant's first assignment of error. The subject of the testimony in question concerned an incident that allegedly occurred a week or two before June 16, 2001, in which six or seven people "jumped" Palomo and Sol.[4] The state elicited many of the details surrounding the earlier assault from Palomo, who survived both incidents, but required hospitalization after each. The relevancy of the underlying assault to the events of June 16, 2001, centered upon the identification of the alleged attackers. During trial, Palomo identified Simas as the "[w]hite * * * American" who shot him in the arm on June 16, 2001, and as one of the people who attacked him in the previous melee. However, it was Benitez who provided perhaps the strongest link between the earlier assault and the conspiracy that ultimately led to Sol's murder. Although Benitez was not present at the previous street fight, the state inquired whether, at some point after the fight, Benitez had learned the identity of one of Palomo's attackers. Defense counsel objected and a bench conference ensued.

After the conference, which was not transcribed, the trial justice dismissed the jury to assess the admissibility of the witness's anticipated response. The state indicated that Benitez would testify about a statement that the decedent, Sol, allegedly made to him after the fight, but before the day of the shooting and alleged conspiracy, when Benitez and Sol were monitoring passersby from the front porch of "Jenni-

4. The timeline of events before the day of the shooting is not entirely clear from the record.

fer's house" on Bergen Street. As a man and a woman walked by them, Sol reportedly remarked to Benitez, "that was one of the kids that jumped [me] and Juan [Palomo]." After the shooting, Benitez identified Angel Rivera from a photo array that Det. Hartnett compiled as the individual that Sol had recognized from the fight days before. In arguing that it was admissible, the state insisted that the decedent's statement to Benitez provided a motive behind Rivera's inquiry into the price attached to killing a Guatemalan, the details of which inquiry would soon be admitted into evidence through the deposition testimony of Arnold. Benitez's testimony, therefore, would provide important background information into the alleged criminal conspiracy and would also operate to strengthen Arnold's credibility, which the latter's well-documented criminal past did not.

The trial justice continued to hear arguments and allowed the prosecuting attorney to question Benitez about his account of the circumstances surrounding the decedent's statement. Over defense counsel's objection, which was largely concerned with the hearsay nature of the statement, the trial justice ruled that the decedent's statement fell under an exception to the prohibition against hearsay; namely, the exception provided in Rule 804(c).[5] With citation to *State v. Burke*, 574 A.2d 1217, 1222 (R.I.1990), the trial justice made the following findings to support his ruling:

"I'm satisfied that this is a statement directly that falls within the scope of [Rule] 804(c). It is a declaration of a decedent made in good-faith, I find so from the circumstances provided thus far to me, and that, obviously, it was

made before the commencement of the action and upon personal knowledge of the declarant. Because, the testimony and evidence before me indicates that Mr. Sol was, indeed, at the very scene of that fight. The objection is overruled."

Thereafter, the court recessed. When trial reconvened on the next day, the jury was escorted back into the courtroom, and Benitez testified to the decedent's statement, Det. Hartnett's photo array, and the subsequent identification of Rivera.

The defendant begins his argument on appeal by acknowledging that this Court has affirmed, on several occasions, resort to Rule 804(c) in criminal trials, although he adds that Rhode Island is the only jurisdiction in the country to do so. The defendant readily observes that our seminal case on the matter, *Burke*, analyzed the Sixth Amendment's Confrontation Clause as construed by the Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). However, defendant posits that the Supreme Court's altered interpretation of those requirements in *Crawford* should affect the jurisprudence of this Court in two significant ways. First, defendant would have us acknowledge that *Crawford* overturned *Roberts*, or at least cast such a shadow "that *Roberts* will be a dead letter before too long." In this way defendant seeks to shield himself from the rule of *Burke* and its progeny. Second, defendant argues that *Crawford* compels this Court to declare unconstitutional the application of Rule 804(c) in the criminal context. Thus, using *Crawford* as a sword, defendant contends that we must conclude that the trial justice's failure to exclude the hearsay

**5.** Rule 804(c) of the Rhode Island Rules of Evidence, entitled *"Declaration of Decedent Made in Good Faith,"* provides that "[a] declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

statement violated defendant's right, under the Sixth Amendment to the United States Constitution, "to be confronted with the witnesses against him." [6]

It is our opinion that defendant's position on *Crawford* is too broadly stated and that his reliance thereon, based on the facts before us, is misplaced. However, before we examine the Supreme Court's holding in *Crawford* and its effect on the jurisprudence of the Sixth Amendment, we first review our case law on the applicability of Rule 804(c) in criminal proceedings.

In *Burke*, this Court rejected the argument that the introduction of otherwise inadmissible hearsay testimony under Rule 804(c) must be limited to civil proceedings. *Burke*, 574 A.2d at 1221–22. There, the defendants robbed and beat the owner of a small variety store. *Id.* at 1219. Although the victim died before trial, the Superior Court admitted an out-of-court statement under Rule 804(c) that implicated the defendants and that the decedent had made to his daughter when he returned from the hospital on the evening of the robbery. *Burke*, 574 A.2d at 1223. In allowing the introduction of the out-of-court statement, the trial justice found that the requirements of Rule 804(c) were satisfied because the decedent spoke to a blood relative, rather than a police officer, and because he did so before the defendants were arrested, shortly after the robbery occurred, and prior to the commencement of the action. *Burke*, 574 A.2d at 1223.

On appeal, we began our analysis with reference to the language of the Advisory Committee's Note to Rule 804(c), which, unchanged to this day, clearly articulated the intended reach of the exception into both civil and criminal cases.[7] *Burke*, 574 A.2d at 1222. The positive authority for our decision under the Sixth Amendment, however, rested in the Supreme Court's construction of the Confrontation Clause in *Roberts*, which articulated a general approach to the admissibility of hearsay evidence. *Burke*, 574 A.2d at 1222; *see also Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. We read *Roberts* to hold that, when the hearsay declarant is not present for cross-examination, the admissibility of an out-of-court statement turns on whether the statement bears adequate "indicia of reliability," which, in the case of a "firmly rooted hearsay exception," simply can be

---

**6.** Although we are cognizant that the Supreme Court recently granted certiorari likely to resolve a split amongst the federal circuit courts about whether *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), applies retroactively to cases on *collateral* review, *see Bockting v. Bayer*, 399 F.3d 1010 (9th Cir.2005), *cert. granted, Whorton v. Bockting*, —— U.S. ——, 126 S.Ct. 2017, 164 L.Ed.2d 778 (2006), the high court's ultimate decision is immaterial to the disposition of the case before us because, at the time the Supreme Court issued *Crawford*, defendant's case was pending *direct* review in this Court by nature of his timely appeal. *See Pailin v. Vose*, 603 A.2d 738, 742 (R.I.1992) (recognizing that, if a defendant's case is pending direct review when a new rule of criminal procedure is announced, the defendant benefits retroactively from the new rule).

**7.** The Advisory Committee's Note to Rule 804(c) states, in pertinent part:

"Unlike the exception for dying declarations contained in proposed [R]ule 804(b)(2), this exception applies in all criminal and civil cases, and is not limited to the cause or circumstances of the declarant's impending death."

In *State v. Burke*, 574 A.2d 1217, 1221–22 (R.I.1990), we also cited and dismissed the consequence of a holding of the Supreme Judicial Court of Massachusetts in *Commonwealth v. Gallo*, 275 Mass. 320, 175 N.E. 718, 724–25 (1931), which limited the application of a similar statute to civil proceedings, in part because of the clear language of the Advisory Committee's Note quoted above.

inferred without further inquiry. *Burke,* 574 A.2d at 1222, 1223 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). In other cases, however, such as the case before us in *Burke,* the statement must carry "particularized guarantees of trustworthiness" or be excluded as an affront to the defendant's right to confrontation. *Burke,* 574 A.2d at 1222, 1223 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). Holding that the trial justice's findings fulfilled the requirements set out in Rule 804(c), and holding further that those findings displayed the statement's "particularized guarantees of trustworthiness," we affirmed. *Burke,* 574 A.2d at 1223.

In *Crawford,* decided approximately two years after the jury verdict in the present case, the Supreme Court palpably altered the jurisprudence of the Sixth Amendment. *See Horton v. Allen,* 370 F.3d 75, 83 (1st Cir.2004). Pertinently, the *Crawford* Court pronounced that the Confrontation Clause strictly prohibited the admission of hearsay evidence in the form of "testimonial" statements, absent a showing of unavailability and a prior and meaningful opportunity for cross-examination, irrespective of substantive guarantees of evidentiary reliability.[8] *Crawford,* 541 U.S. at 57, 59, 61, 124 S.Ct. 1354; *accord Mancusi v. Stubbs,* 408 U.S. 204, 213–16, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page,* 390 U.S. 719, 722–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Mattox v. United States,* 156 U.S. 237, 240–44, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Although the Supreme Court did not fully define "testimonial," Justice Scalia, writing for the majority, indicated that out-of-court statements "which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" would qualify as "testimonial" and thus were embraced by the Sixth Amendment's procedural right to confrontation. *Crawford,* 541 U.S. at 51, 52, 124 S.Ct. 1354 (quoting Brief of Amici Curiae the National Association of Criminal Defense Lawyers at 3).

The Supreme Court recently underscored the constitutional significance of "testimonial" statements in *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which addressed the specific and distinguishable context of out-of-court statements gathered during the course of police interrogations. *See id.* at 2274 n. 2 (noting that "our holding today makes it unnecessary to consider whether and when statements made to someone *other than law enforcement personnel* are 'testimonial' "). (Emphasis added.) While this qualification limits Davis's usefulness in analyzing whether the decedent's out-of-court statement in the present case was "testimonial," we nevertheless observe that the Davis Court reinforced the proposition, which the *Crawford* Court had only suggested, that the Confrontation Clause,

> "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Davis,* 126 S.Ct. at 2274 (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354).

---

8. We note that, although the Supreme Court identified dying declarations as potentially removed, on historical grounds, from scrutiny under the Confrontation Clause, the justices declined, in *Crawford,* to consider "whether the Sixth Amendment incorporates an exception for testimonial dying declarations." *Crawford,* 541 U.S. at 56 n. 6, 124 S.Ct. 1354.

Significantly, Justice Scalia, who also penned the majority opinion in Davis, added, "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* The Supreme Court reasoned that "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Id.* at 2273 (citation omitted); *see also Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts* * * *.").

The question for us then becomes how this Court must modify its approach to the admissibility of out-of-court statements under Rule 804(c) in light of the Supreme Court's interpretation of the Confrontation Clause in *Crawford* and *Davis*.

■ We recognize the utility of an additional step in the approach that this Court has applied to ascertain whether the introduction of out-of-court statements in criminal proceedings under Rule 804(c) are admissible. First, the statement at issue must satisfy the requirements prescribed by Rule 804(c) itself, *viz.*, "made in good faith before the commencement of the ac-

tion and upon the personal knowledge of the declarant." *See Burke*, 574 A.2d at 1223. Second, as an additional and potentially dispositive step, an inquiring court must look to whether, under an objective standard, the attendant circumstances display the earmarks of a "testimonial" statement. *See Davis*, 126 S.Ct. at 2273–74 (indicating that inquiry into whether a statement is "testimonial," at least in the context of police interrogations, turns on objectively manifested indicia); *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354; *United States v. Brito*, 427 F.3d 53, 61–62 (1st Cir.2005) (requiring an *ad hoc*, case-by-case examination to determine whether a statement is "testimonial"). If so, the inquiry is at an end, and the hearsay statement must be excluded, absent a showing of a prior and meaningful opportunity for cross-examination, even though the statement qualifies under Rule 804(c). *See Crawford*, 541 U.S. at 59, 61, 124 S.Ct. 1354. Third, if the decedent's statement is not "testimonial," the residual "indicia of reliability" requirement nevertheless must be satisfied, by virtue of this Court's adoption in *Burke* of the rationale set forth in *Roberts*, as the final threshold before admittance.[9] *See Burke*, 574 A.2d at 1222.

The circumstances of the decedent's statement in the instant case form a common nucleus that amply satisfies each inquiry. In line with our holding in *Burke*, we are satisfied that Sol's statement to a friend identifying Rivera as one of the six or seven people who recently had attacked

---

9. The defendant does not raise the right of "accused persons * * * to be confronted with the witnesses against them," embedded in article 1, section 10, of the Rhode Island Constitution, as an independent ground for reversal. Nor does the state argue that the "indicia of reliability" requirement we adopted in *Burke* should be relaxed in light of *Crawford*. In the circumstances of this case, therefore, we need not, and do not, reexamine the rationale we set forth in *Burke* for the admission of out-of-court statements under Rule 804(c). We also recognize that the requirements of Rule 804(c), namely, that the declaration be "made in good faith before the commencement of the action and upon the personal knowledge of the declarant," often will satisfy the "indicia of reliability" criterion applied in *Burke*, 574 A.2d at 1222–23; nevertheless, the two inquiries are separate and distinct.

him and Palomo was made in good faith. *See Burke,* 574 A.2d at 1223; *see also* Rule 804(c). The record also clearly established that the decedent had personal knowledge of the street fight, and further, that the statement was made before the commencement of the action in this case—indeed, days before the shooting even occurred. *See Burke,* 574 A.2d at 1223; *see also* Rule 804(c).

Next, although the trial justice did not have the benefit of the Supreme Court's holding in *Crawford* during trial, we are satisfied, based on our *de novo* review in such matters, *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997) (stating that mixed questions of law and fact that have an impact on constitutional matters call for *de novo* review), that the decedent's casual remark to an acquaintance was not "testimonial" because it was not "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Davis,* 126 S.Ct. at 2274 (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354); *see also, e.g., United States v. Hansen,* 434 F.3d 92, 100 (1st Cir.2006) (casual remarks amongst coconspirators); *United States v. Danford,* 435 F.3d 682, 687 (7th Cir.2006) (conversation between a store manager and an employee); *United States v. Franklin,* 415 F.3d 537, 545 (6th Cir.2005) (statements made to a friend by happenstance); *United States v. Hendricks,* 395 F.3d 173, 181 (3d Cir.2005) (lawfully obtained wiretap recordings of multiple conversations between the defendants); *Horton,* 370 F.3d at 84 (private conversation between drug dealer and client). Moreover, the decedent could not reasonably have believed that his statement to Benitez would have been available for use at a later trial. *See Crawford,* 541 U.S. at 52, 124 S.Ct. 1354. There is no indication in the record that Sol ever reported the alleged assault by Rivera to the police; nor do we deem it reasonably likely that he would have been at all inclined to invoke the criminal justice system or seek recourse to the courts for an alleged affront by the six or seven assailants.

Lastly, in light of the companionable relationship between the decedent and Benitez, and the serious nature of the statement's subject matter, namely, a recent attack on the decedent and Palomo by six or seven persons that resulted in Palomo's hospitalization, we are convinced that "particularized guarantees of trustworthiness" existed that satisfy the "indicia of reliability" requirement we adopted in *Burke,* 574 A.2d at 1223. *See Campbell,* 691 A.2d at 569 (providing for *de novo* review in such matters).

We hold, therefore, based on the facts before us, that the decedent's statement to Benitez was not "testimonial" and, as a consequence, not subject to the Confrontation Clause. Accordingly, we reject defendant's asseveration that *Crawford* unreservedly prohibits the application of Rule 804(c) in criminal proceedings, but we leave for another day the chore of fleshing out the extent to which the Supreme Court's elucidation of the Confrontation Clause otherwise affects our case law on the subject, if at all. It is enough for our purposes today that defendant's position lacks merit in the circumstances of the present case.

**B. Testimony of the Medical Examiner**

■ Next on his quartet of alleged errors, defendant contends that the trial justice's failure to prevent the state's expert witness, Dr. Swartz, from answering a series of hypothetical questions constituted an abuse of discretion. Specifically, defendant argues that the state's questions to Dr. Swartz pertaining to the gun's position at the time of the shooting called for answers that were "based purely on specula-

tion or conjecture" and served only to mislead the jury. Further, defendant avers that Dr. Swartz's answers exhibited a substantial prejudice that demands reversal.

■■■■ Hypothetical questions, in this jurisdiction, long have been considered an acceptable means of eliciting expert opinions. *See* R.I. R. Evid. 703. "[T]o be considered admissible, a hypothetical question to an expert witness must embrace all the essential elements of the situation as they appeared in evidence." *Avarista v. Aloisio,* 672 A.2d 887, 891 (R.I.1996) (quoting *Tavernier v. McBurney,* 112 R.I. 159, 161, 308 A.2d 518, 520 (1973)). On review, "the admission of a hypothetical question rests within the sound discretion of the trial justice," *Tate v. Schwartz,* 511 A.2d 971, 974 (R.I.1986), and "a discretionary power should not be disturbed unless it clearly appears that such discretion has been improperly exercised or that there has been an abuse thereof * * *." *Id.* (quoting *Berberian v. Travisono,* 114 R.I. 269, 273–74, 332 A.2d 121, 124 (1975)).

The defendant relies on *State v. Hanes,* 783 A.2d 920, 927 (R.I.2001), to support his contentions that the state's hypothetical questions about the gun's position served only to mislead the jury and that Dr. Swartz's answers to those questions were without proper foundation. Much like this case, the issue in *Hanes* revolved around a series of hypothetical questions stemming from the underlying testimony of the state's expert medical examiner, who, after performing an autopsy on the victim, testified: "[t]he trajectory through [the victim] was from his front to his back, his left to his right, and downward at approximately 75 degrees." *Id.* at 926. Based on this observation, the witness concluded that, assuming the gun was fired straight on, the victim would have been "bent at the waist and turned slightly to the right when

he was shot." *Id.* The hypothetical questions at issue in *Hanes,* however, surfaced during the defense counsel's cross-examination of the state's witness, from which exchange we recount below:

"Q. So it had—from the top of his body to down his body, it had somewhat of a down trajectory?

"A. Yes. I described it as downward at about 75 degrees.

"Q. You stated that the position, that if the gun were directly at him that he would be in a position somewhat leaning like, so the bullet came through the top part of his body and traveled down in a direction like this (indicating)?

"A. Yes.

"Q. Sort of leaning over putting his hand toward his back pocket, correct?

"[THE STATE]: Objection.

"THE COURT: Sustained. Witness will not answer. Jury will disregard the question." *Id.*

Although we held that the defendant had not properly preserved the issue for appeal, we proceeded nevertheless to review, and ultimately reject, the defendant's argument that defense counsel appropriately framed the inquiry about the position of the victim's hand as a hypothetical question. *Hanes,* 783 A.2d at 927. We premised our analysis by observing that the manner in which defense counsel framed the second question above, *viz.,* whether, based on the bullet's trajectory, the victim *"would be* in a position somewhat leaning like," rendered the third question inappropriate. *Id.* We reasoned that "[a]n affirmative answer to that question would have implied that, based on the bullet's trajectory, the victim *would be* leaning over putting his hand toward his back pocket, not simply that the trajectory was *consistent* with such a conclusion." *Id.* Because the record did not provide a basis for the

witness to determine what the victim was doing with his hand at the moment he was shot—as opposed to his general posture—this Court held that the trial justice properly sustained the state's objection. *Id.*

In the matter under review, Dr. Swartz testified that, based on her examination during the autopsy, if the decedent were standing erect, "the path of the bullet would have been from the decedent's right to left and front to the back and slightly upward" at an angle "[l]ess than 45 degrees." This testimony formed the evidentiary backdrop for the colloquy from which we quote at length:

"Q. Could you determine * * * where the gun would have been to cause the entrance wound to where you located the bullet consistent with the path?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: She may answer.

"A. No, you can't. A lot depends on the body. It is not a static object, and if there is movement at the time of shooting he didn't necessarily have to be upright and straight on.

" * * *

"Q. Can you determine to a reasonable degree of scientific certainty—taking into account this factor that the body was sitting or standing straight up with the path of the bullet, can you determine where the gun would have been?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: She can answer. I will let her, if she can.

"A. Yes, sir, if the body is not moving.

"Q. Where would the gun have been?

"A. Well, in that case the gun would be in front of the body and slightly below the entrance wound.

"Q. If you were—can you determine to a reasonable degree of scientific certain-

ty, taking into account the body was leaning to the left with the entrance wound, the path and where you located the bullet, where the gun would have been?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: What is the basis of the objection?

"[DEFENSE COUNSEL]: This hypothetical assumes no facts in evidence to this case to date.

"THE COURT: Overruled.

" * * *

"A. If the body were leaning then a gun would not necessarily have to be below and upward angle. May I demonstrate?

"THE COURT: Yes.

" * * *

"A. Okay. As we had said first, if the body is not moving, perfectly still, to get that angle of trajectory a gun would have to be slightly in front, slightly lower than the entrance wound and on the right side. However, if the body is moving—I really can't say if the body were, for example, leaning to the left and the bullet entered the right front of the abdomen and traveled—if the trajectory were straight—say the shooter were aiming straight, it would travel across the body to the opposite side. Yet when he sat up again it would now be higher.

"Q. That would be it, as you indicated?

"A. Upward angle, even though the shooting didn't necessarily occur that way.

"Q. That is the gun was placed underneath that is but low, pointing upward, correct? You said before someone sitting straight up the gun would have to be below, pointing upward?

"A. Correct.

"Q. But if they were leaning over it would have to be low, pointing upwards?

"A. No, it would not.

"Q. It would be an angle. The gun, what angle?

"A. It could be a straight angle.

"Q. Thank you doctor."

This Court is unpersuaded that inquiry into the gun's position in the case at bar compares in any meaningful way to the speculation involved in determining what the victim was doing with his hand in *Hanes.* Our *dictum* in *Hanes* simply echoes the long-standing proposition that essential facts must be disclosed before an expert can render an opinion in response to a hypothetical question. *See Hanes,* 783 A.2d at 927. In *Hanes,* nothing in evidence could have enabled a medical expert to render an opinion that the victim was "putting his hand toward his back pocket" while he was leaning. *Id.* However, in the case before us, we perceive no deficiency in the disclosure of facts necessary for Dr. Swartz to render an opinion about the possible positions of the gun, much like the witness's unchallenged opinion about the victim's general posture in *Hanes. See id.* at 926. Nor do we perceive that the state framed the hypothetical questions in such a manner as to mislead the jury. *See State v. Capalbo,* 433 A.2d 242, 247–48 (R.I.1981). Thus, we hold that the trial justice did not abuse his discretion in allowing Dr. Swartz to respond to the hypothetical questions at issue on appeal and, consequently, we need not address defendant's allegation of prejudicial error.

### C. Prior Identification through an Interpreter

■ Detective Hartnett's testimony recounting Palomo's identification of Simas forms the basis for defendant's last evidentiary challenge. During trial, Det. Hart-nett testified that, when presented with a photo array at the police station the morning after the shooting, Palomo identified Simas as the individual responsible for the injury to his left arm. When asked how he orally communicated with Palomo, Det. Hartnett testified that a "uniformed officer" served as a Spanish interpreter during the identification. In Det. Hartnett's words, Palomo, in the presence of the interpreter, "pointed to [the photo of Simas] and, then, after pointing to it wrote down on the sheet of paper in Spanish 'this is the person who shot at the car.'" The photo array, which bore Palomo's written assertion in Spanish below Simas's picture, then was introduced as a full exhibit without objection, after testimony that the police employed neutral, non-suggestive procedures for obtaining the identification.

It is defendant's contention that Det. Hartnett's testimony about Palomo's written assertion is inadmissible hearsay. The defendant initially concedes that, if the witness understood Spanish, testimony about Palomo's written assertion "would not have been objectionable" because the detective would have his own first-hand understanding of the Spanish statement. However, because Det. Hartnett did not understand Spanish, the witness did not testify to what Palomo, as the declarant, actually wrote, but instead to what the interpreter said Palomo wrote, *viz.,* "this is the person who shot at the car." In this situation, defendant argues, the only way "to legitimize the photo line-up as being completely non-suggestive and reliable," would have been to call the Spanish-speaking officer as a witness. Because the interpreter did not testify, and because, as defendant alleges without further elaboration, Palomo's identification of Simas carried "great significance" in defendant's conviction, defendant concludes that the

trial justice's alleged abuse of discretion constitutes reversible error.

■ To support his general assertion that Det. Hartnett's testimony was inadmissible hearsay, defendant relies upon two long-standing opinions of this Court in *State v. Epstein*, 25 R.I. 131, 140, 55 A. 204, 208 (1903) and *State v. Terline*, 23 R.I. 530, 539–40, 51 A. 204, 208 (1902). We decline the invitation to revisit substantively these holdings because defendant has not properly preserved the issue for appeal. *See, e.g., State v. Harris*, 871 A.2d 341, 345 (R.I.2005) ("It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'") (quoting *State v. Saluter*, 715 A.2d 1250, 1258 (R.I.1998)). When an issue for which sought-after appellate review is evidentiary, Rule 103(a)(1) of the Rhode Island Rules of Evidence explicitly provides that a finding of error must be predicated upon "a timely objection or motion to strike * * * of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Our case law states with abundant clarity that "issues that were not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999) (quoting *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994)). General objections to the admissibility of evidence, when the context does not supply the specific ground for the objection, are thus insufficient to preserve the issue under Rule 103(a)(1). *State v. Lassiter*, 836 A.2d 1096, 1103–04 (R.I. 2003); *cf. State v. Baptista*, 894 A.2d 911, 914 n. 2 (R.I.2006) (holding that a motion *in limine* before trial seeking unsuccessfully to exclude the particular type of evidence, coupled with the trial justice's im-

mediate cautionary instruction to the jury, made the specific ground for defendant's general objection apparent).

In the instant case, the relevant portions of Det. Hartnett's testimony display the deficiency of defense counsel's objections:

"Q. * * * [I]n your presence did Mr. Palomo through the interpreter indicate to you he could identify the person?

"A. Yes.

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Overruled.

" * * *

"Q. And in your presence through the interpreter what was Mr. Palomo's response?

"A. He pointed to [the photo of Simas] and, then, after pointing to it wrote down on the sheet of paper in Spanish 'this is the person who shot at the car.'"

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Overruled."

Even if we were to overlook the temporal insufficiency of defense counsel's objections, the general, rather than specific, character of the objections failed to adequately alert the trial justice to defendant's concern, articulated on appeal, that the translation of Palomo's written assertion, to which Det. Hartnett testified, was inadmissible hearsay. Indeed, the authority upon which defendant relies in advancing his appellate argument, which this Court has not addressed in more than 100 years, only amplifies the necessity for a specific, sufficiently focused objection to invite the trial justice's deliberate examination as a precursor to any meaningful review on appeal. Further, despite defendant's contention otherwise, the context surrounding defense counsel's general objections does not reveal the grounds on

which those objections relied with the specificity that our case law requires.

■ The residual question before us, therefore, is whether, notwithstanding defendant's failure to properly preserve a challenge to the alleged hearsay in Det. Hartnett's testimony, the circumstances of this case nevertheless warrant our review. This Court will review unpreserved assignments of error, as an exception to our raise-or-waive rule, when they implicate "basic constitutional rights," *State v. Donato*, 592 A.2d 140, 141 (R.I.1991), and further satisfy three conjunctive elements:

> "First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. * * * Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law of which counsel could not reasonably have known at the time of trial." *State v. Lynch*, 854 A.2d 1022, 1040 (R.I. 2004) (quoting *State v. Ramsey*, 844 A.2d 715, 719 (R.I.2004)).

We need go no further than the first element above to dispose of defendant's argument. Palomo himself testified that he identified Simas from Det. Hartnett's photo array the morning after the shooting. During his testimony, Palomo acknowledged his handwriting on the photo array, from which a sworn court interpreter translated in court before the jury as follows: "I don't know his name, but he was the one that shot at me on Bergen Street." We are convinced beyond a reasonable doubt that the admission of Det. Hartnett's testimony about Palomo's written assertion, if error at all, was harmless. Consequently, because defendant's unpreserved claim fails to satisfy the first dispositive requirement to our exception, we deem defendant's argument waived.

## D. Double Jeopardy

■ Addressing defendant's final appellate issue, we are unmoved by his entreaty that we should reconsider our holding in *Rodriguez*, 822 A.2d at 906–08. On several occasions, we have relied on Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure in holding that "the defense of double jeopardy can be raised only by a motion filed before trial and that a defendant's failure to so move constitutes a waiver of his or her right to do so * * *." *State v. Grayhurst*, 852 A.2d 491, 500 (R.I.2004) (quoting *State v. McGuy*, 841 A.2d 1109, 1115 (R.I.2003)); *see also, e.g., State v. Harnois*, 853 A.2d 1249, 1253 (R.I.2004). A defendant can obtain relief from the strong medicine that Rule 12(b)(2) dispenses only upon a showing of good cause before the trial justice. *See State v. Haney*, 842 A.2d 1083, 1084 (R.I. 2004). In the present case, the record shows that defendant did not raise the defense of double jeopardy in the requisite pretrial motion, nor did he seek relief during trial from the consequences of his inaction. Indeed, defense counsel took issue with the imposition of consecutive life sentences only during the sentencing phase of trial. The defendant's failure to properly raise the defense of double jeopardy before trial, therefore, constitutes a waiver of that issue on appeal.

Although we need not reach the substance of defendant's proffered argument, we observe that *Rodriguez* legitimated precisely that which defendant decries. In *Rodriguez*, this Court, construing the parallel double-jeopardy provisions of the federal and state constitutions, held that the crimes of first-degree murder and discharging a firearm while committing a crime of violence do not merge for double-jeopardy purposes because each crime requires proof of an additional element that the other does not. *Rodriguez*, 822 A.2d

at 906–08 (applying the different-crimes test propounded in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). Further, we noted that even if the two criminal statutes at issue proscribed the same conduct, the General Assembly's affirmative act in specifically authorizing consecutive sentences in such circumstances operated to defeat challenges sounding in double jeopardy. *Id.* at 907–08 (citing *Missouri v. Hunter,* 459 U.S. 359, 368–69, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)).

In the instant case, the defendant presents no fact or circumstance distinguishable from the matter before us in *Rodriguez.* That the defendant received consecutive life sentences in accordance with the exact same crimes that were at issue in *Rodriguez* only underscores the frailty of the defendant's position. *See McGuy,* 841 A.2d at 1115 (extending, by syllogism, our holding in *Rodriguez* to the crimes of second-degree murder and carrying a dangerous weapon). We also observe that, since our decision in *Rodriguez,* 822 A.2d at 907–08, the General Assembly's directive for consecutive sentencing in this regard has remained unchanged. *See* G.L.1956 § 11–47–3.2. At the base of our holding in *Rodriguez* was the fundamental principle that "[l]egislatures, not courts, prescribe the scope of punishments." *Hunter,* 459 U.S. at 368, 103 S.Ct. 673. To do otherwise, we observed recently, "even if based on sound policy and the best of intentions, would be to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of Rhode Island government." *DeSantis v. Prelle,* 891 A.2d 873, 881 (R.I.2006). Thus, following both precedent and prudence, and because, in any event, the issue is deemed waived pursuant to Rule 12(b)(2), we hold that the defendant's argument is without merit.

### Conclusion

For the reasons stated herein, we affirm the judgment of conviction and remand the case to the Superior Court.