**STATE**

v.

**Kenneth DAY.**

**No. 2005–81–C.A.**

Supreme Court of Rhode Island.

July 2, 2007.

---

Lauren S. Zurier, Providence, for Plaintiff.

Paula Lynch, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

On June 10, 2004, a jury found the defendant, Kenneth Day, guilty of the following felonies: conspiracy to commit robbery, conspiracy to commit carjacking,[1]

1. General Laws 1956 § 11–39–2, one of the statutes under which defendant was indicted (and ultimately convicted), does not actually use the term "carjacking"; rather, the statute refers to the crime as "[r]obbery of the owner, lessor, or occupant of a motor vehicle." Nevertheless, since the term "carjacking" is so widely used to characterize the crime at issue,

conspiracy to commit murder, two counts of first-degree robbery, two counts of carjacking resulting in death, and two counts of murder. Thereafter, on August 16, 2004, he received three ten-year sentences on the three conspiracy counts to be served concurrently, two ten-year sentences on the robbery charges to be served consecutively to each other and to the sentences on the conspiracy counts, and four sentences of life imprisonment without parole on the carjacking and murder counts to be served consecutively to each other and to the other sentences. The court further ordered that the defendant serve all of these sentences consecutively to those that had previously been imposed as a result of other criminal convictions.

The defendant has appealed to this Court, contending (1) that the trial justice exceeded his authority in imposing four consecutive sentences of life imprisonment without parole; (2) that the trial justice erred in denying defendant's motion for a judgment of acquittal; (3) that defendant's conviction on both murder and the underlying carjacking felony violated the double jeopardy clause; (4) that the trial justice violated defendant's Sixth Amendment right to confrontation when he admitted the recorded testimony of a witness who had testified in an earlier criminal trial in federal court; (5) that the trial justice erred in allowing the introduction of evidence of a conversation between that same witness and defendant while they were in custody; (6) that the trial justice erred in denying defendant's motion for a new trial;

and (7) that defendant's sentence was excessive.[2]

For the reasons set forth herein, we affirm the judgment of the Superior Court in part and reverse it in part.

## Facts[3] and Travel

On the evening of June 8, 2000, twenty-year-old Jason Burgeson left his parents' home in his white, four-door 1991 Ford Explorer to pick up Amy Shute, his twenty-one-year-old girlfriend. The two young people then drove into Providence, where they met two of Jason's friends, Joshua Wilson and Ray Reed, at Tommy's Bar and Grill in downtown Providence at around 10:30 p.m. All four of them left Tommy's after about an hour and headed in Jason's car to Bootleggers, a dance club in Providence.

Jason, Amy, Joshua, and Ray arrived at Bootleggers at around midnight, where they met three other friends. Upon leaving Bootleggers, the group of seven friends spent five or ten minutes discussing possible plans as to how they might pass the remainder of the night. At approximately 1:20 a.m., Jason, Amy, Joshua, and Ray headed from Bootleggers to where Jason's car was parked. The four friends piled into Jason's car and listened to music from a portable Discman as Jason drove back to the parking lot at Tommy's Bar and Grill. There, the four of them sat in another car for approximately twenty or twenty-five minutes before Jason and Amy exited that car and headed back to Jason's car.

---

we shall, for the sake of clarity, use that term throughout this opinion as a shorthand manner of referring to the statute.

2. We address defendant's contentions in the order that he has presented them, except that we address the two sentencing-related contentions at the very end of this opinion.

3. The following facts were adduced from the testimony of the multiple witnesses who testified at trial or whose prior recorded testimony was admitted.

On the afternoon of June 9, 2000, at approximately 12:30 or 1 p.m., a grounds-keeper at Button Hole Golf Course, which is located partly in Providence and partly in Johnston, discovered the bodies of a young man and a young woman slumped against some hay bales on a part of the golf course in Johnston that was under construction. The bodies were later identified as being those of Jason and Amy.

During a survey of the crime scene, Detective Raymond Pingitore of the Johnston Police Department found spent handgun casings and a live round of handgun ammunition, but he did not locate a handgun at the scene. Based upon that information and his observation of the two bodies, he determined that the two deaths were possibly homicides. He also observed tire tracks leading to the two bodies, but he did not find a motor vehicle at the scene.

Detective David Detora of the Johnston Police Department's Bureau of Criminal Investigation also responded to the scene that day. His trial testimony that a live round of ammunition and spent handgun casings were found at the scene corroborated Detective Pingitore's testimony. Detective Detora testified that he had found a latex glove approximately sixty-one feet from the victims, as well as a ripped empty condom wrapper about thirty feet from the victims. Amy's wallet and a Sony Discman were also recovered at the scene.

In the course of contacting the families of the victims, the police learned that, on the evening of June 8, Jason had been driving a white, four-door 1991 Ford Ex-plorer bearing a Massachusetts license plate reading "7461EE." Detective Pingitore issued a BOLO[4] alert for Jason's car at approximately 7 p.m. on June 9.

At approximately 8:30 p.m. on June 9, Stephen Gencarella, a patrol officer in the Providence Police Department who had heard the BOLO, pulled over a vehicle that corresponded to the broadcast description. He later turned the driver of the vehicle, Gregory Floyd, over to the Johnston Police Department.

Pursuant to a search warrant executed at approximately 4 a.m. on June 10, police seized the following items from the residence in which Floyd and defendant lived: a .40–caliber semiautomatic handgun,[5] a clip adjacent to the gun with two live rounds in it, a gun holster, and another live round of ammunition. At that point, the Johnston Police Department took defendant into custody.

At the Johnston Police Station, defendant gave a statement to the police after waiving his *Miranda* rights. The defendant admitted that he, Gregory Floyd, Harry Burdick,[6] Raymond Anderson, and Samuel Sanchez had been riding around in Sanchez's car on June 8 and talking about "getting somebody," which defendant explained meant robbing someone. The defendant denied that he himself had intended to participate in the robbery about which he was being questioned, noting that he had just received his paycheck; but he also stated that he had no choice but to participate because he was a passenger in Sanchez's car. The defendant told the police that, at some point in the course of the

---

4. In this context, "BOLO" means "be on the lookout."

5. Ballistics analysis revealed that this gun was the source of the bullets that killed Jason and Amy. Additionally, it was determined that

Amy's blood was present on the muzzle of the pistol.

6. Harry Burdick had contacted the Johnston Police Department on June 9 in order to make a statement.

night, Sanchez parked the car. Floyd and Burdick then exited the car and returned a few minutes later in a white Jeep [7] with two people in the back seat.

According to defendant, Sanchez then drove his car behind the Jeep to a location which defendant described as being "like a desert." The defendant explained that Floyd wanted to kill the two occupants of the car and that they were pleading for their lives. The defendant denied that he had heard any conversation about raping either of the victims. The defendant stated that he turned and ran as soon as Floyd shot the male victim and that he only heard, rather than saw, the shooting of the female victim. In his statement to the police, defendant admitted that when he arrived home that night he took Floyd's jacket upstairs, but he denied that it had a gun in it. The defendant stated that he did not know how the gun seized by the police had ended up in his room.

Anderson and Sanchez were also taken into custody on June 10, 2000, and Sanchez's Chevrolet Nova was impounded in connection with the crimes that had been committed. Police recovered the following objects from the Nova: two Grand Casino coins, a Freedom flyer, numerous foreign coins, an arcade coin, and approximately fourteen photographs.[8] The defendant's left and right thumbprints were found on some of the photographs. A condom that was still wrapped and an unwrapped condom were also seized from the Nova. The lot number on the ripped empty condom wrapper discovered at the crime scene was identical to the lot number on the wrapped condom found in the Nova. Additionally, it was determined that hairs from Burdick's head were present in the impounded car.

The testimony of Gregory Floyd [9] presents the most detailed account of what transpired late on June 8 and early on June 9, 2000; [10] in the following paragraphs, we summarize his version of those chilling events.

According to Floyd, he and defendant left their Taylor Street apartment in the late afternoon or early evening of June 8 to play pool in downtown Providence. At defendant's suggestion, Floyd brought along a gun that he had previously purchased for protection but had never used before. Upon arriving downtown by bus, Floyd and defendant socialized at Mama Metro's Café on Weybosset Street. The defendant left for about ten minutes to converse with a man who had approached him in the café wanting to buy drugs. When defendant returned, he asked Floyd to help him rob that man, whom he had told to wait outside in an alley. Unable to locate the man in the alley, Floyd and defendant set out to find him. During their ultimately unsuccessful attempt to find that man, defendant and Floyd went

---

7. Although the stolen car was actually a Ford Explorer, defendant referred to it as a Jeep. To be consistent with defendant's statement to the police, we shall also refer to the vehicle as a Jeep where defendant did.

8. A search of the Ford Explorer conducted after Floyd's arrest revealed flyers with the word "Freedom" on them (which flyers were similar to the one found in the Chevrolet Nova), some Grand Casino coins, one broken blue mug, one Tasmanian Devil mug, and some compact disks (CDs).

9. Floyd had testified at an earlier federal court trial relating to the same criminal incidents as are involved in this case. His recorded testimony from that trial was admitted at defendant's state court trial pursuant to Rule 804(b)(1) of the Rhode Island Rules of Evidence. See section III, infra.

10. Not surprisingly, the facts contained in defendant's statement to the police and those contained in Floyd's federal court trial testimony are not entirely congruent in all respects.

to Kennedy Plaza, where they met Harry Burdick and his girlfriend.

After chatting briefly about the plan to rob the man who had sought to buy drugs from defendant, Burdick expressed interest in joining defendant and Floyd in that endeavor. After another unsuccessful fifteen minute search for the man, defendant, Floyd, and Burdick headed to another downtown establishment called Saki's Pizza. The defendant telephoned Raymond Anderson, who agreed to travel downtown with Samuel Sanchez in order to meet defendant, Floyd, and Burdick and help them locate the targeted man.[11] Anderson and Sanchez arrived in the latter's brown or tan Chevrolet Nova. A subsequent search for the man in Sanchez's car yielded no results, so the four men started discussing other potential targets.

Floyd, Burdick, Anderson, Sanchez, and defendant eventually parked the car behind Saki's Pizza because it was low on gas, and they continued their quest on foot. They spotted a lone man on a cell phone, and they started to approach him to rob him (with defendant suggesting that Floyd use his gun), but they had to scatter when several other people arrived at the scene.

The five men also came close to robbing and carjacking two women and a man who had stopped at an outdoor automated teller machine (ATM) on South Main Street in Providence at around 12:30 a.m., but they abandoned their plan when defendant alerted the others about an approaching security guard.[12] They returned briefly to Saki's Pizza, where Burdick grabbed some latex gloves before reentering Sanchez's car in order to attempt to locate other potential targets.

While traveling on Weybosset Street, the five men spotted Jason and Amy sitting on the steps of the Arcade[13] with their Ford Explorer parked nearby. After a discussion in the car, Floyd, Burdick, Anderson, Sanchez, and defendant decided that Floyd and Burdick would attempt to rob and carjack Jason and Amy while Anderson, Sanchez, and defendant would wait in Sanchez's car. If the robbery and carjacking were successful, the men waiting in the car would follow Floyd and Burdick in the stolen car; but, if the robbery and carjacking were unsuccessful, the Sanchez vehicle would serve as a getaway car.

As Floyd and Burdick approached the two targets, Floyd pulled out his gun and they asked Jason for money. When he replied that he did not have any, Burdick made the same inquiry of Amy, but she stated that she did not have any either. Concerned at this point about traffic coming through the area, Floyd and Burdick told the victims to get into Jason's Explorer. Once in the Explorer, Amy handed a few dollars over to Burdick. Burdick inquired as to the whereabouts of the keys to the car, and Jason replied that they were in the ignition. Burdick then instructed Floyd to start the car and drive over to meet the other men, who were in Sanchez's car. At this point, Floyd was driving, and Burdick held the gun on Ja-

---

11. Floyd's testimony on this point was corroborated by Anderson's girlfriend, who testified that, shortly after receiving a page on the night of June 8, "Sammie" (presumably a reference to Samuel Sanchez) picked Anderson up in his car.

12. The testimony of the two women, the man who accompanied them, and the security guard, as well as footage from the security cameras at the Textron building corroborated Floyd's description of the aborted robbery attempt at the South Main Street ATM.

13. The Arcade is a well-known and architecturally significant shopping plaza in the heart of downtown Providence.

son and Amy, who were seated in the back seat.

When Floyd drove the Explorer by the place where the Sanchez vehicle was waiting, Sanchez and the other miscreants began to follow the Explorer.[14] After Sanchez flashed his high beams, both cars stopped alongside each other so that the miscreants could discuss how to proceed. Although all five men had their faces shielded from the victims, all five were aware that Jason and Amy were passengers in the Explorer. Sanchez told Floyd to follow him, and eventually they all ended up at what Floyd initially thought was a construction site but which was, in actuality, Button Hole Golf Course.

According to Floyd, the five men then exited the cars to decide what to do next. When Sanchez suggested killing the two victims, defendant agreed on the ground that they had seen his face. Shortly thereafter, defendant also suggested raping Amy. Then the five men entered the Explorer where the two victims were, and they proceeded further into the Button Hole Golf Course property to a more concealed location. No one stayed with Sanchez's car, and no one voiced any opposition to the criminal plan.

At this point, another discussion among the five men about how to proceed took place outside of the car. Floyd suggested letting the victims go free, but defendant was worried about the fact that they had seen his face. Sanchez also wanted to kill them. The defendant then began harassing Amy. He told Amy that "[n]othing will happen to you" "if you give me head," but she refused and started crying. Floyd, who was now holding the gun, instructed defendant to leave her alone. Burdick then attempted to leave the scene, but the others stopped him. Although Sanchez grabbed the gun from Floyd and wanted to kill Burdick for fear that he would inform the police about the crimes, Floyd convinced Sanchez not to do so by vouching for Burdick's ability to keep silent.

After Floyd regained control of his gun, the discussion concerning the fate of the two victims resumed. After a few minutes, Anderson pulled Jason and Amy out of the car and made them sit on the ground about three feet from the Ford Explorer. At that point, Floyd distributed to the other four men the latex gloves that Burdick had taken from Saki's Pizza,[15] and all five men searched the vehicle twice for valuables, but no one actually located anything to take at that time. Resuming their prior discussion, Sanchez and defendant indicated that they wished to kill Jason and Amy, while Anderson and Burdick did not seem to have an opinion about that subject. This "shouting war" (as Floyd described it) lasted for approximately twenty-five minutes, during which time Jason and Amy sat on the ground frightened, crying, and pleading for their lives. Finally, Sanchez issued an ultimatum to Floyd: "If you're not going to do it, I'm going to do it." Floyd then yelled, "That's

---

14. Officer John Lough of the Providence Police Department testified that, while on patrol in the early morning hours of June 9, 2000, he had noticed a white Ford Explorer and a dark Chevrolet Nova traveling in tandem at a high rate of speed down Weybosset Street in downtown Providence. Officer Lough recalled the racial identity of the driver of the Explorer, which was the same as Floyd's racial identity, and Officer Lough further stated that he saw a subject in the passenger seat as well as two subjects in the back seat. Accordingly, this testimony of Officer Lough is corroborative of this aspect of Floyd's account.

15. Forensic analysis revealed that the latex gloves found at the murder scene were of the same color, texture, and type as the latex gloves regularly used at Saki's Pizza.

enough." He then pulled the trigger about three times.

After Floyd shot Jason and Amy, the five miscreants ran to the Ford Explorer, and Sanchez drove it up the hill to his Chevrolet Nova. Anderson and defendant asked Floyd whether Jason and Amy were dead, and Floyd replied that he did not know. Once they reached the top of the hill, Sanchez grabbed a couple of flyers and a cup of coins out of the Explorer,[16] and the five men drove to a nearby gas station. While at the gas station, the men used the money from the cups of change that Sanchez had stolen from the Explorer to fill the tanks of both cars with gas.

Sanchez, accompanied by Anderson, drove defendant in Sanchez's Nova to defendant's apartment at 94 Taylor Street with Floyd and Burdick following in the Ford Explorer. Floyd, upon seeing defendant's aunt on the porch, wrapped the gun he had used to shoot Jason and Amy in a coat and handed the coat to defendant, who took it upstairs to the room that he and Floyd were sharing.

Floyd then drove Burdick to Travelers Aid in downtown Providence.[17] Upon learning that Burdick's girlfriend was not there, Floyd drove Burdick home to Pawtucket. As Burdick was exiting the car, he thanked Floyd for convincing the others not to kill him that night, and he reassured Floyd that he would not say anything about what had transpired. After leaving Burdick's house, Floyd returned to Providence and parked the Ford Explorer in the Urban League parking lot near his apartment.

On December 18, 2000, a federal grand jury indicted defendant and co-defendants Floyd, Burdick, Anderson, and Sanchez for (1) conspiracy to commit a carjacking and (2) carjacking with death resulting in violation of federal statutory law. *See United States v. Sanchez,* 354 F.3d 70, 73 (1st Cir.2004). Thereafter, Floyd, Burdick, Anderson, and Sanchez all entered into plea agreements with the federal government pursuant to which they were spared the possibility of receiving the death penalty. *Id.* The defendant, however, opted to go to trial. *Id.* On February 26, 2002, the trial judge granted defendant's motion for a judgment of acquittal on the ground that the government had failed to prove beyond a reasonable doubt one of the elements of the federal crimes of which defendant stood accused—namely, that he had intended to murder Jason and Amy at the time of the carjacking.

On August 29, 2003, defendant was indicted in state court on the following nine counts: (1) conspiracy to commit robbery; (2) conspiracy to commit carjacking; (3) conspiracy to commit murder; (4) and (5) first-degree robbery; (6) and (7) carjacking of a motor vehicle resulting in death; and (8) and (9) first-degree murder.

After four days of jury selection and after consideration by the court of several pretrial motions, the trial commenced on June 2, 2004. Thereafter, on June 10, 2004, defendant was found guilty of all nine charges. After defendant's motion for a new trial was denied on June 29, 2004, he was sentenced on August 16, 2004. The defendant timely filed this appeal on August 31, 2004.

---

16. Testimony of several witnesses revealed that Jason had two cups containing change in his Explorer on the night of June 8, 2000. One cup was white with a Tasmanian Devil on it; the other was a large blue cup. Testimony also revealed that Jason had been handing out flyers earlier that evening as he was leaving Bootleggers.

17. This portion of Floyd's testimony was corroborated by footage from the security camera at Travelers Aid.

## Analysis

## I

### Motion for Judgment of Acquittal

 The defendant argues that the trial justice erred in denying the motion for a judgment of acquittal that defendant filed with respect to several counts in the indictment. He states that the prosecution did not sufficiently prove that he conspired in the carjacking or in the murders, of which conspiracies he was accused in counts 2 and 3.[18] Additionally, he contends that the substantive carjacking and robbery charges (counts 4, 5, 6, and 7) merge because the evidence supporting each of them was identical.[19]

 When reviewing a trial justice's decision regarding a motion for a judgment of acquittal based upon a claim of legal insufficiency of the evidence, this Court applies the same standard as that used by the trial justice. *State v. Otero*, 788 A.2d 469, 475 (R.I.2002); *see also State v. Imbruglia*, 913 A.2d 1022, 1027 (R.I.2007); *State v. John*, 881 A.2d 920, 925 (R.I.2005). In doing so, we accord full credibility to the prosecution's witnesses, we view the evidence in the light most favorable to the prosecution, and we draw "all reasonable inferences consistent with guilt" from that evidence. *State v. Snow*, 670 A.2d 239, 243 (R.I.1996); *see also John*, 881 A.2d at 925; *Otero*, 788 A.2d at 475.

 A motion for a judgment of acquittal should be granted if the evidence, construed in the light most favorable to the prosecution, is insufficient to establish the defendant's guilt beyond a reasonable doubt. *State v. Moran*, 699 A.2d 20, 28 (R.I.1997). On the other hand, a motion for a judgment of acquittal must be denied if a reasonable juror could find the defendant guilty beyond a reasonable doubt. *Snow*, 670 A.2d at 243; *see also State v. Contreras–Cruz*, 765 A.2d 849, 852 (R.I. 2001).

## A

### Conspiracy to Commit Murder

 We do not reach defendant's argument that he was entitled to a judgment of acquittal on count 3 (conspiracy to commit murder) because that issue is not properly before us.

 It is well settled that issues that were not raised at the trial level "are not properly preserved for appellate review." *State v. Cardoza*, 649 A.2d 745, 748 (R.I. 1994); *see also State v. Lopes*, 884 A.2d 397, 399 (R.I.2005); *State v. Saluter*, 715 A.2d 1250, 1258 (R.I.1998). We have repeatedly held that a defendant may only appeal the denial of a motion for judgment of acquittal "if the defense has rested its case * * * or renews the motion at the

---

18. It should be noted that defendant does not challenge the denial of his motion for a judgment of acquittal regarding his conviction of conspiracy to commit robbery (count 1).

19. The defendant also contends that he was entitled to a judgment of acquittal with respect to the two first-degree murder charges to the extent that those convictions were based on any theory other than felony murder, but he has failed to develop that contention in any meaningful way. A mere passing reference to an argument such as this, without meaningful elaboration, will not suffice to

merit appellate review. *See Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); *see also* Sup.Ct. R. Art. I, R. 16(a); *James J. O'Rourke, Inc. v. Industrial National Bank of R.I.*, 478 A.2d 195, 198 n. 4 (R.I.1984); *Mercurio v. Fascitelli*, 116 R.I. 237, 243–44, 354 A.2d 736, 740 (1976).

conclusion of the presentation of all the evidence." *State v. Studley*, 671 A.2d 1230, 1231 (R.I.1996) (quoting *State v. Clark*, 576 A.2d 1202, 1206 (R.I.1990)); *see also State v. Disla*, 874 A.2d 190, 195 (R.I.2005); *State v. Andreozzi*, 798 A.2d 372, 374 (R.I.2002).

In the instant case, defendant moved for a judgment of acquittal twice-initially after the prosecution rested its case and again immediately thereafter when defendant rested without presenting a defense. In neither of those motions, however, did defendant argue that he was entitled to a judgment of acquittal with respect to count 3 (conspiracy to commit murder).[20] As a result, defendant has not properly preserved for appellate review his argument that the trial justice erred in denying his motion for a judgment of acquittal with respect to the count of conspiracy to commit murder.

## B

### Conspiracy to Commit Robbery and Conspiracy to Commit Carjacking

The defendant argues that he was entitled to the grant of his motion for a judgment of acquittal on count 2 (conspiracy to commit carjacking). He contends (a) that insufficient evidence existed to prove beyond a reasonable doubt that he had entered into two separate conspiracies (to rob the victims and to carjack the victims) and (b) that, accordingly, insufficient evidence existed to prove beyond a reasonable doubt that he conspired to carjack the two victims.[21] We are persuaded that defendant's contentions are meritorious.

The defendant was indicted on separate counts alleging commission of the crimes of conspiracy to commit robbery (count 1) and conspiracy to commit carjacking (count 2). Conspiracy has been defined as "an agreement by two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *State v. Lassiter*, 836 A.2d 1096, 1104 (R.I.2003) (internal quotation marks omitted). Proof of the agreement, including proof of its existence and scope, is all that is required for a defendant to be found guilty of the conspiracy. *Disla*, 874 A.2d at 197.

In this case, since defendant does not challenge the denial of his motion for a judgment of acquittal regarding count 1 (conspiracy to commit robbery), we need only address whether or not the denial of his motion for a judgment of acquittal regarding count 2 (conspiracy to commit carjacking) was warranted. Our review of

---

**20.** Even though a narrow exception to our raise-or-waive rule exists, defendant's claim fails to fulfill the strict criteria which govern the availability of that exception. *See State v. Mastracchio*, 672 A.2d 438, 446 (R.I.1996); *see also Pollard v. Acer Group*, 870 A.2d 429, 432 n. 10 (R.I.2005); *State v. Breen*, 767 A.2d 50, 57 (R.I.2001); *State v. Cardoza*, 649 A.2d 745, 748 (R.I.1994); *State v. Burke*, 522 A.2d 725, 731 (R.I.1987).

**21.** Although defendant does not expressly characterize his second contention as a double jeopardy argument, it is better described and analyzed as such. *See State v. Grabowski*, 644 A.2d 1282, 1284 (R.I.1994) (analyzing defendant's argument that first-degree mur-

der and second-degree murder constitute the "same offense" under the double jeopardy clause).

We realize that defendant has forfeited his right to challenge these convictions on double jeopardy grounds because he chose not to file a Super. R.Crim. P. 12(b)(2) motion prior to trial. *See* section I C, *infra*. Nevertheless, we have decided to address the issue of two separate conspiracies *vel non* because it is so integrally related to our resolution of defendant's argument regarding the denial of his motion for a judgment of acquittal with respect to the conspiracy to rob and conspiracy to carjack counts.

the record persuades us that a reasonable juror could not properly conclude from the evidence that defendant was guilty beyond a reasonable doubt of conspiracy to commit carjacking because there is no evidence of an agreement to commit carjacking that is separate from the agreement to commit robbery.

With respect to situations such as this, this Court employs the United States Supreme Court's "same evidence" test, *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which calls for an inquiry as to "whether each offense requires proof of a fact that the other does not." *In re Malik D.*, 730 A.2d 1070, 1074 (R.I.1999) (quoting *State v. Lemon*, 497 A.2d 713, 719 (R.I.1985)); *State v. Davis*, 120 R.I. 82, 86, 384 A.2d 1061, 1064 (1978).

■ In the context of conspiracy charges, this "same evidence" test is applied in a manner that differs somewhat from the way that it is applied with respect to other criminal charges. *United States v. Booth*, 673 F.2d 27, 29 (1st Cir.1982). A conspiracy may constitute only one offense even if the conspiratorial agreement envisioned is based upon multiple criminal offenses or unlawful acts. *State v. Giorgi*, 115 R.I. 1, 4, 339 A.2d 268, 270 (1975); *State v. Gilman*, 110 R.I. 207, 212, 291 A.2d 425, 429 (1972).

■ In *Booth*, 673 F.2d at 29, the First Circuit usefully itemized five factors that should be considered when deciding whether or not two or more conspiracy charges are, in actuality, reducible to a single conspiracy. The factors to be considered are: "(1) the time during which the activities occurred; (2) the persons involved in the conspiracies; (3) the places involved; (4) whether the same evidence was used to prove the two conspiracies; and (5) whether the same statutory provision was involved in both conspiracies."

*Id.* We shall employ the five-factor analytical approach suggested in *Booth* as we evaluate this aspect of the instant appeal.

■ It is our opinion that the trial justice erred when he ruled that two separate conspiracies existed. Application of the five factors itemized in *Booth* has led us to conclude that the robbery and the carjacking were but two objects of the same conspiracy. First, both criminal deeds occurred over the course of the same night. Second, the persons charged in both conspiracies—Gregory Floyd, Harry Burdick, Raymond Anderson, Samuel Sanchez, and defendant—were the same. Third, all of the events relating to the formation of the conspiracies transpired in downtown Providence. Fourth, the same evidence was used to prove the two conspiracies. It is only the fifth factor that weighs against a ruling that the conspiracies were, in fact, a single conspiracy, as defendant was charged under two separate underlying statutes—G.L.1956 § 11–39–1 and § 11–39–2(c). Nevertheless, after carefully considering the *Booth* factors in their totality, we are persuaded that defendant's motion for a judgment of acquittal should have been granted as to count 2 (conspiracy to commit carjacking).

■ In cases such as this, where a defendant has been charged with multiple conspiracies but only one exists in actuality, in order to safeguard the defendant's constitutional right not to be placed in double jeopardy, he or she should be sentenced with respect to only one of the counts with the other count(s) being dismissed. *See Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

In view of the foregoing considerations, while defendant's conviction on count 1 (conspiracy to commit robbery) stands, we have no choice but to direct a judgment of

acquittal with respect to count 2 (conspiracy to commit carjacking).

## C

## Merger of the Substantive Robbery and Carjacking Counts

The defendant next argues that he was entitled to a judgment of acquittal because the *substantive* robbery and carjacking offenses merge. He contends that the same evidence was used to prove both of the charges and that they were, in fact, only a single offense. We agree.

■ We are troubled by the fact that defendant did not raise his merger contention in a pretrial motion filed pursuant to Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure. We have previously indicated that a merger argument "is essentially a double jeopardy argument." *State v. Grayhurst*, 852 A.2d 491, 500 (R.I. 2004). As such, Rule 12(b)(2) is applicable; [22] that rule provides in pertinent part: "The defense of double jeopardy * * * may be raised *only by motion before trial.*" (Emphasis added.) Consequently, a defendant's failure to raise such a motion before trial precludes that defendant from thereafter raising a double jeopardy challenge. *See State v. Feliciano*, 901 A.2d 631, 647 (R.I.2006); *Grayhurst*, 852 A.2d at 500; *State v. Haney*, 842 A.2d 1083, 1084 (R.I.2004); *State v. McGuy*, 841 A.2d 1109, 1115 (R.I.2003). Since a ruling that a defendant's double jeopardy argument is meritorious would render a trial on the merits with respect to one of those charges unnecessary,[23] only upon a showing of "good cause" may a defendant be relieved from the strict mandate of the rule. *Feli-*

*ciano*, 901 A.2d at 647; *see also Grayhurst*, 852 A.2d at.500; *Haney*, 842 A.2d at 1084; *McGuy*, 841 A.2d at 1115.

In the instant case, however, because our case law has arguably not until today focused with maximal explicitness on the necessity of bringing a merger argument to the attention of the trial court through a pretrial Rule 12(b)(2) motion and because the trial justice did address the merger argument when he ruled on defendant's motion for a judgment of acquittal, we have decided not to hold that defendant has forfeited his right to raise this argument before us. Accordingly, we shall next address the merits of defendant's contentions.

■ As we indicated in section I B of this opinion, *supra,* when it is necessary to determine whether or not two offenses constitute two separate offenses, this Court has adopted the "same evidence" test enunciated in *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180. Consequently, where a single act or transaction constitutes a violation of two distinct provisions of the criminal law, we must consider "whether each provision requires proof of a fact which the other does not." *See State v. Rodriguez,* 822 A.2d 894, 905 (R.I.2003) (quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180); *see also Grayhurst,* 852 A.2d at 501.

■ In this case, defendant was indicted on two counts of first-degree robbery (counts 4 and 5) and on two counts of carjacking resulting in death (counts 6 and 7). In Rhode Island, the elements of the offense of robbery are the same as at

---

**22.** We recognize that there will be situations where it will not be possible for a trial justice to rule on a Rule 12(b)(2) motion regarding a merger argument prior to trial. We emphasize, however, that failure to file such a mo-

tion prior to trial entails the grave risk of forfeiture of a legal argument.

**23.** *See State v. Pearson,* 49 R.I. 386, 391, 143 A. 413, 415 (1928).

common law.[24] Accordingly, in this jurisdiction, robbery consists of the "felonious and forcible taking from the person of another of goods or money [of] any value by violence or [by] putting [the victim] in fear." *State v. Briggs*, 787 A.2d 479, 487 (R.I.2001) (internal quotation marks omitted); *see also State v. Grant*, 840 A.2d 541, 548 (R.I.2004). Additionally, first-degree robbery requires that, in addition to proof of the foregoing elements, there also must be proof of the use of a dangerous weapon by the accused. *State v. Arroyo*, 844 A.2d 163, 171 (R.I.2004).

The elements of carjacking resulting in death are set forth in § 11–39–2 (entitled "Robbery of the owner, lessor, or occupant of a motor vehicle"); that statute provides in pertinent part:

"(a) Every person who shall unlawfully seize a motor vehicle from its lawful owner, lessor, or occupant by use or threat of use of a dangerous weapon against the owner, lessor, or occupant resulting in serious bodily injury * * * *shall be guilty of first degree robbery* * * *.

" * * *

"(c) Every person who shall commit robbery of a motor vehicle by seizing it from its lawful owner, lessor, or occupant under the circumstances set forth in subsection (a) or (b) of this section, resulting in the death of the owner, lessor or occupant, shall be guilty of first degree murder * * *." (Emphasis added.)

When we compare the elements of the common law felony of robbery and the statutory crime of carjacking resulting in death with which defendant was charged in this case, we are not sufficiently satisfied that each offense "requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180. Significantly, the above-quoted statute governing carjacking in this jurisdiction specifically and in so many words equates carjacking and robbery.

It is our opinion that the trial justice erred in denying defendant's motion for a judgment of acquittal regarding counts 4 and 5 (robbery). Consequently, while defendant's conviction on counts 6 and 7 (carjacking resulting in death) stands, we have no choice but to direct a motion for a judgment of acquittal with respect to counts 4 and 5 (robbery).

## II

### Alleged Violation of the Double Jeopardy Clause

█ The defendant next contends that his convictions on both of the counts relating to the murder of the two young people (counts 8 and 9) and the two counts relating to the underlying felony of carjacking resulting in death (counts 6 and 7) violated the double jeopardy clause of the Fifth Amendment to the United States Constitution. He argues that, since (in his view) there was insufficient evidence for the jury to find premeditation upon which to base his first-degree murder conviction, that conviction must have been based upon the felony murder theory and that, therefore, he should not have been convicted of both felony murder and the underlying felony. We do not reach this argument because defendant has failed to properly preserve it for our review.

*State v. Grant*, 840 A.2d 541, 548 (R.I.2004); *State v. Rodriquez*, 731 A.2d 726, 729 (R.I. 1999).

24. Although Rhode Island has a statute that sets forth the penalties for the crime of robbery (G.L.1956 § 11–39–1), the elements of that crime are not defined in that statute.

■ As discussed in section I C, *supra,* absent a showing of "good cause," a defendant is barred from raising the defense of double jeopardy if he or she did not file a Rule 12(b)(2) motion before trial. *Feliciano,* 901 A.2d at 647; *Grayhurst,* 852 A.2d at 500; *Haney,* 842 A.2d at 1084; *McGuy,* 841 A.2d at 1115. In the instant case, defendant did not raise the defense of double jeopardy before trial, and we perceive no "good cause" that would motivate us to allow him to raise this argument for the first time at the appellate level. In addition to the fact that defendant did not file a Rule 12(b)(2) motion raising his double jeopardy argument, it is noteworthy that defendant did not raise this issue at any time during the trial.

Accordingly, this Court will not address this issue because it has not been properly preserved for appellate review.

## III

### Prior Recorded Testimony

The defendant next argues that the trial justice violated his Sixth Amendment right to confrontation when, acting in reliance on Rule 804(b)(1) of the Rhode Island Rules of Evidence, he admitted the recorded testimony of a witness, Gregory Floyd, who had testified at an earlier criminal trial in federal court as to the events that transpired on June 8 and 9, 2000.[25] The defendant contends that the trial justice wrongly determined (a) that the witness was unavailable and (b) that defendant had had an adequate opportunity to cross-examine the witness during the earlier federal court trial.

---

**25.** Floyd had testified at the earlier trial of defendant in federal court, which involved charges of conspiracy to commit a carjacking and also carjacking with death resulting; that trial stemmed from the same incidents as those which gave rise to this case. Although Floyd was physically present at defendant's state court trial, he was deemed unavailable

## A

### Unavailability of the Witness

■ We do not reach defendant's argument regarding the trial justice's finding that Floyd was unavailable as a witness[26] because defendant has failed to properly preserve it for review by this Court. We have repeatedly held that an issue is not properly before this Court if it was not raised at the trial level. *See, e.g., Cardoza,* 649 A.2d at 748; *see also Lopes,* 884 A.2d at 399. With respect to evidentiary rulings, when one side objects to the introduction of evidence for only one specific reason, any other ground for objection, even if later raised at the appellate level, is deemed to have been waived. *State v. Neri,* 593 A.2d 953, 956 (R.I.1991); *see also State v. Bettencourt,* 723 A.2d 1101, 1107 (R.I.1999). In the instant case, defendant did not object at trial to the determination that Floyd was unavailable; rather, defendant limited his argument concerning the admissibility of Floyd's prior testimony to the adequacy of defendant's opportunity to cross-examine him at the earlier trial. Accordingly, we will only review the trial justice's ruling that defendant's opportunity to cross-examine Floyd at the federal court trial was sufficient to warrant the introduction of Floyd's recorded federal court testimony in defendant's state court trial.

## B

### Adequacy of Opportunity to Cross–Examine Witness

■ The decision as to whether or not to admit former testimony lies in the

---

under Rule 804 of the Rhode Island Rules of Evidence because he refused to testify.

**26.** Unavailability is one of the prerequisites to the admissibility of prior recorded testimony. *See* Rule 804(b)(1) of the Rhode Island Rules of Evidence.

sound discretion of the trial justice, and we will not overturn such a decision unless there has been an abuse of that discretion. *State v. Sharp*, 708 A.2d 1328, 1330 (R.I. 1998); *see also State v. Ouimette*, 110 R.I. 747, 754, 298 A.2d 124, 130 (1972). The defendant argues that the trial justice erred in finding that defendant had had an adequate opportunity to cross-examine Floyd because the cross-examination of that witness occurred during a federal trial concerning a different charge. We disagree. As we explain below, it is our opinion that the trial justice reached the correct conclusion as to this issue, and, therefore, we uphold his ruling.

■ The Sixth Amendment to the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." It should be noted that the right of confrontation is not absolute; it is limited by practical considerations and by concerns relating to judicial economy. *State v. Sosa*, 839 A.2d 519, 524 (R.I.2003).

■ As a result of the United States Supreme Court's exegesis of that explicit constitutional provision, it is now established that, when testimonial hearsay evidence is concerned, the Confrontation Clause requires proof of (1) the witness's unavailability and (2) a prior opportunity for cross-examination. *Crawford v. Wash-*

*ington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); [27] *see also Davis v. Washington*, —— U.S. ——, ——, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006); *Feliciano*, 901 A.2d at 640; *State v. Lynch*, 854 A.2d 1022, 1039 (R.I.2004).

Rule 804(b)(1) allows previous sworn testimony of an unavailable witness to be admissible if the party against whom admission is sought was afforded an adequate opportunity to cross-examine the witness in the prior proceeding.[28] *Sharp*, 708 A.2d at 1329. Admission of prior testimony under this rule does not violate the Confrontation Clause of the Sixth Amendment because both of the judicially established criteria relative to that clause (see preceding paragraph) are satisfied if there has been adherence to the rule. *See Sharp*, 708 A.2d at 1329–30.

■ We have previously held that we adhere to the so-called "liberal" rule when determining the adequacy of prior opportunities to cross-examine witnesses. *Ouimette*, 110 R.I. at 757, 298 A.2d at 131; *see also Sharp*, 708 A.2d at 1330. Under that rule, it is required only that there be a *substantial* identity of issues and of parties before former testimony will be deemed admissible. *Ouimette*, 110 R.I. at 757, 298 A.2d at 131; *see also Sharp*, 708 A.2d at 1330. In the present situation, it is clear to us that such a substantial identity of both issues and parties existed. While the specific crimes at issue in the

---

**27.** We are aware that the United States Supreme Court recently held that *Crawford* is not to be applied retroactively. *Whorton v. Bockting*, —— U.S. ——, ——, 127 S.Ct. 1173, 1177, 167 L.Ed.2d 1 (2007). However, we note that defendant's trial took place a few months after *Crawford* was decided; accordingly, the *Crawford* holding is pertinent to this case.

**28.** Rule 804(b) provides in pertinent part:

"(b) *Hearsay Exceptions.* The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) *Former Testimony.* Recorded testimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered * * * had an opportunity to develop the testimony by direct, cross, or redirect examination."

two trials differed slightly, both trials related to the same sequence of events.

After considering the arguments of both the prosecution and defendant, the trial justice in this case denied defendant's motion to prohibit the prosecution from introducing at trial the prior federal trial testimony of Floyd. The trial justice declared Floyd to be unavailable and then ruled that, for the purpose of satisfying the criteria set forth in Rule 804(b)(1), the cross-examination of Floyd had been "more than adequate" and "rather effective." He noted that the cross-examination covered the events which occurred before, during, and after the carjacking and killings. He emphasized that the cross-examination was not required to be exhaustive, but only needed to constitute a sufficient probing of the witness's credibility. The trial justice then pointed out that defense counsel in the federal court trial had impeached Floyd concerning certain details about what transpired before the killings. In addition, the trial justice stated that defendant had been present during the federal court testimony, giving him the ability, through his attorney, to confront the witness there. He concluded that defendant not only had ample opportunity to cross-examine Floyd, but also that he had in fact seized that opportunity.

The trial justice properly analyzed and concluded that defendant had had an adequate opportunity to cross-examine Floyd

at the prior proceeding.[29] The trial justice certainly did not abuse his discretion in admitting the prior recorded testimony.

## IV

### The Adoptive Admission

■ The defendant next argues that the trial justice erred in allowing the introduction of proof of a conversation that took place between Floyd and defendant while both were in adjacent cells in the Garrahy Courthouse in Providence. The trial justice relied upon the adoptive admission doctrine in allowing proof of the conversation at issue.[30]

Patrick Keeley, a member of the Rhode Island Sheriff's Department, testified at trial as follows regarding the conversation between defendant and Floyd that occurred on June 12, 2000:

"Q. Sheriff Keeley, between the two men, Kenneth Day and Gregory Floyd, who spoke first?

"A. Kenneth Day.

"Q. What did you hear Kenneth Day say?

"A. I overheard Kenneth Day say to Gregory Floyd, 'You better tell the truth about what happened. I'm not going down for this. You're the one who did it.'

"Q. What did you hear Floyd respond?

---

29. Although the trial justice did not allude to the length of cross-examination in making his decision, we find it noteworthy that the cross-examination of Floyd spanned 222 pages of the federal trial transcript.

30. The defendant also challenges the trial justice's additional and *sua sponte* ruling that this statement was admissible under the co-conspirator exception. We agree with defendant that, because the conspiracy had ended earlier when coconspirator Harry Burdick had turned himself in and Floyd and defendant had given their statements to the police,

the trial justice erred in allowing the introduction of this statement under this hearsay exception. *See State v. Patriarca,* 112 R.I. 14, 39, 308 A.2d 300, 316 (1973) ("[D]eclarations of co-conspirators made after the termination of the conspiracy may be received only against the declarant * * *."); *see also State v. Burke,* 574 A.2d 1217, 1228 (R.I.1990). However, the fact that the trial justice erred in this regard is of no moment because, as we explain *infra,* the statement was properly admitted as an adoptive admission.

" * * *

"A. Floyd replied, 'You guys hyped me up to do this. I'm not going down by myself.'

"Q. Did Kenneth Day deny that accusation?

" * * *

"A. There was no further conversation, at all." [31]

The defendant contends (a) that the above-referenced dialogue was testimonial in nature, triggering the protection of the Confrontation Clause and (b) that the dialogue was inadmissible because, contrary to what the trial justice ruled, it did not fall within the adoptive admission doctrine. We disagree with these contentions.

## A

### The Alleged Testimonial Nature of the Conversation

The defendant argues that the above-quoted dialogue between Floyd and defendant while both were in adjacent cells was testimonial in nature. The defendant contends that his Confrontation Clause rights were violated because he had no opportunity to cross-examine Floyd regarding the statement. We disagree.

The United States Supreme Court has stated that "not all hearsay implicates the Sixth Amendment's core concerns." *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354. The Confrontation Clause applies only to " 'witnesses' * * * who 'bear testimony.' " *Id.* The Supreme Court in *Crawford* defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (quoting 2 N. Webster, An American Dictionary of the English Language (1828));

see also *Davis*, 126 S.Ct. at 2274; *Feliciano*, 901 A.2d at 642.

■ In this case, a sheriff guarding the cells in which defendant and Floyd were being held overheard a conversation between them, during which they discussed who would be "going down for" the crimes that had been committed a few days before. It is our opinion that the statement by Floyd was not testimonial. It was not "made for the purpose of establishing or proving some fact"; indeed, it is not clear to us from the record that Floyd even knew that Sheriff Keeley was within hearing range. Consequently, the Confrontation Clause does not apply in this situation, and we must analyze the admissibility of Floyd's statement only in light of the Rhode Island Rules of Evidence. *See Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law * * *.").

## B

### Admissibility of Statement under Rhode Island Rules of Evidence

■ A trial justice's rulings with respect to the examination of witnesses at trial are given considerable latitude, and we will not overturn a trial justice's ruling in that context unless we find "an abuse of discretion or substantial injury to a defendant." *State v. Boillard*, 789 A.2d 881, 886 (R.I.2002); *see also State v. Gomez*, 848 A.2d 221, 237 (R.I.2004).

■ Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence deals with adoptive admissions and provides that a statement

**31.** The ellipses in this quotation represent the objections that defense counsel raised to this line of questioning and the trial justice's corresponding overruling of those objections.

is not deemed to be hearsay if it is offered against a party and is "a statement of which the party has manifested his or her adoption or belief in its truth * * *." The adoption does not have to be expressed in words; silence is sometimes sufficient to signify adoption. *See Gomez*, 848 A.2d at 236; *see also United States v. Miller*, 478 F.3d 48, 51 (1st Cir.2007) (noting that the doctrine of adoptive admissions "provides that, in certain circumstances, a party's agreement with a fact stated by another may be inferred from (or 'adopted' by) silence").

This Court has pointed to five factors which a trial justice should consider when determining *inter alia* whether or not to admit evidence of a situation in which an accusatory statement was made within hearing distance of the accused and the accused did not reply: (1) whether the statement was incriminating or accusatory; (2) whether it was one to which an innocent person in the defendant's situation would respond; (3) whether the statement was made within the presence and hearing range of the defendant; (4) whether it was understood by the defendant; and (5) whether the statement was one to which the defendant had an opportunity to respond. *State v. Lambert*, 705 A.2d 957, 962–63 (R.I.1997); *see also State v. Lerner*, 112 R.I. 62, 84, 308 A.2d 324, 338 (1973).

Applying these five factors to the case at hand, we conclude that the trial justice properly admitted, pursuant to the adoptive admission doctrine, Floyd's statement and the fact of defendant's non-response thereto. First, Floyd's statement accused and incriminated defendant regarding his involvement in the events that occurred during the night of June 8 and the early morning of June 9, 2000. Second, a reasonable, innocent person in defendant's position would have responded to the statement in view of its accusatory

nature and in view of the fact that defendant had initiated the conversation with Floyd. Third, Floyd's statement was made within the presence and hearing range of defendant himself, as is evident from the fact that Floyd was able to hear defendant's comment that immediately preceded the contested statement; additionally, Sheriff Keeley testified that defendant and Floyd were only about a foot away from each other and that their ability to hear the other speak was unimpeded. Fourth, the fact that defendant initiated, and thus determined the subject matter of, the conversation, convinces us that he knew and understood what Floyd meant by his accusatory statement. Fifth, it is clear to us that defendant had an opportunity to respond to this statement because defendant and Floyd had been "freely talking" before the statement and there is no evidence in the record to suggest that something occurred to prevent defendant from speaking after the accusatory statement was uttered. Accordingly, we uphold the trial justice's decision to admit Floyd's accusatory statement and the fact of defendant's non-response thereto.

## V

### Motion for a New Trial

The defendant next argues that the trial justice erred in denying defendant's motion for a new trial. He contends that the trial justice incorrectly determined (1) that the evidence presented by the prosecution was sufficient to prove beyond a reasonable doubt all of the elements of the charged offenses and (2) that the evidence presented was sufficient to sustain the convictions even without Floyd's testimony. We disagree with defendant's contentions.

This Court will accord a trial justice's ruling on a motion for a new trial great weight if he or she has articulated

sufficient reasoning in support of the ruling. *Imbruglia*, 913 A.2d at 1028; *State v. Hallenbeck*, 878 A.2d 992, 1011 (R.I.2005); *State v. Rieger*, 763 A.2d 997, 1002 (R.I. 2001). We will not overturn a trial justice's ruling regarding such a motion unless we determine that he or she has committed clear error or that he or she has "overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *State v. Bolduc*, 822 A.2d 184, 187 (R.I.2003); *see also Imbruglia*, 913 A.2d at 1028.

▬▬▬ "[T]he trial justice acts as a thirteenth juror when considering whether to grant or deny a motion for a new trial." *Imbruglia*, 913 A.2d at 1028; *State v. Abreu*, 899 A.2d 473, 477 (R.I.2006). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *see also Abreu*, 899 A.2d at 477. If the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did, the verdict should be affirmed and the motion for a new trial denied. *Imbruglia*, 913 A.2d at 1028; *Abreu*, 899 A.2d at 477.

▬▬▬ In the instant case, the trial justice correctly engaged in the requisite review. He articulated the three steps outlined above and then carefully carried out each of them. In an extensive analysis conducted in light of the jury charge, the trial justice set forth the elements of each of the crimes of which defendant was convicted and ultimately concluded that the elements of those crimes had been proven beyond a reasonable doubt. He explained how the evidence supported the conspiracy charges and how that evidence (given the fact that Rhode Island follows the *Pinkerton* rule [32]), along with defendant's presence and encouragement during the crimes, translated into sufficient support for the convictions on the substantive robbery, carjacking, and murder charges.

The trial justice then proceeded to the second prong of the analytical framework, determining that all of the state's witnesses, including Floyd, were believable and reiterating that the evidence proved beyond a reasonable doubt that defendant was guilty of each of the nine crimes of which he was convicted.

Finally, the trial justice dealt with the third prong, expressly stating that he himself would have found defendant guilty of all nine of the crimes, relying on defendant's words referring to "getting somebody" and "robbing them" to explain that defendant was criminally responsible for the heinous acts which the state had proven had taken place on the night in question. Consequently, the trial justice denied defendant's motion for a new trial.

We perceive no clear error, nor do we think that the trial justice misconceived or overlooked any evidence. Accordingly, we uphold the denial of defendant's motion for a new trial.

## VI

### Sentencing Issues

#### A

#### Imposition of Four Consecutive Sentences of Life Imprisonment Without Parole

The defendant also argues on appeal that the trial justice exceeded his authority

---

32. *See Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (holding that a coconspirator is criminally liable for the actions of another coconspirator if those actions were committed in furtherance of the existing conspiracy); *see also State v. Harnois*, 853 A.2d 1249, 1256 (R.I. 2004).

in imposing four consecutive sentences of life without parole. The defendant received two of those sentences for his two convictions on carjacking resulting in death (counts 6 and 7), and he received the other two for his two first-degree murder convictions (counts 8 and 9). He contends that the statute governing penalties for carjacking does not allow a defendant to be punished with more than one sentence of life without parole with respect to any one death, and he also argues that the trial justice followed an erroneous procedure in imposing these sentences. We do not reach these issues today because they are not properly before us.

■ It is well settled in this jurisdiction that a challenge to a criminal sentence must begin with the filing of a motion in the Superior Court pursuant to the provisions of Rule 35 of the Superior Court Rules of Criminal Procedure.[33] *State v. Collins*, 679 A.2d 862, 867 (R.I.1996); *see also State v. Hesford*, 900 A.2d 1194, 1198 (R.I.2006); *Bettencourt*, 723 A.2d at 1114. If a defendant opts to file a Rule 35 motion and then is aggrieved by the Superior Court's decision regarding the motion, he or she may appeal to this Court. *Collins*, 679 A.2d at 867; *see also Hesford*, 900 A.2d at 1198; *Bettencourt*, 723 A.2d at 1114. However, we will not "consider the validity or legality of a sentence" on direct appeal unless extraordinary circumstances exist. *Collins*, 679 A.2d at 867; *see also Hesford*, 900 A.2d at 1198; *Bettencourt*, 723 A.2d at 1114.

■ The record in the instant case is devoid of any Rule 35 motion filed by defendant in an attempt to correct or reduce his sentence. The defendant contends that the fact that G.L.1956 § 12–19.2–5 confers on this Court the right and duty to conduct a *de novo* review of sentences of life without parole[34] somehow exempts him from the requirement that he first file a Rule 35 motion. We disagree. We see no good reason for departing from the age-old practice whereby issues are first litigated at the *nisi prius* level and then reviewed by us on appeal.[35] And we perceive absolutely no indication in § 12–19.2–5 that the General Assembly has mandated that we make such a departure from long-established practice.

While we have indicated that "extraordinary circumstances" could justify the bypassing of the Rule 35 requirement, *Collins*, 679 A.2d at 867, we can perceive no extraordinary circumstances in the instant situation. Given our affirmance (see *supra*) of most of defendant's convictions on several very grave felonies, he will be serving a very long prison sentence while the Rule 35 proceedings take place (if he opts

33. Rule 35 of the Superior Court Rules of Criminal Procedure provides in pertinent part:
 "(a) *Correction or reduction of sentence.* The court may correct an illegal sentence at any time. The court may correct a sentence imposed in an illegal manner and it may reduce any sentence when a motion is filed within one hundred and twenty (120) days after the sentence is imposed, or within one hundred and twenty (120) days after receipt by the court of a mandate of the Supreme Court of Rhode Island issued upon affirmance of the judgment or dismissal of the appeal, or within one hundred and twenty (120) days after receipt by the court of a mandate or order of the Supreme Court of the United States issued upon affirmance of the judgment, dismissal of the appeal, or a denial of a writ of certiorari."

34. General Laws 1956 § 12–19.2–5 does not actually use the term "*de novo,*" but it is clear to us that said statute does, in fact, mandate a *de novo* review of sentences of life without parole. *See* footnote 39, *infra*.

35. One of the advantages of this practice is that it allows this Court to benefit from the reasoning and insights of the Superior Court justice who conducts the Rule 35 proceeding.

to initiate such proceedings). We fail to see how he would be prejudiced by our requiring that his case follow the usual Rule 35 track rather than considering his arguments on this direct appeal. In short, there is no reason to characterize the present circumstances as "extraordinary." [36]

For these reasons, this Court will not consider at this time defendant's argument that the trial justice exceeded his authority in imposing four consecutive sentences of life without parole on defendant. *See Collins,* 679 A.2d at 867.

## B

### Life Imprisonment without Parole

Finally, invoking § 12–19.2–5, defendant appeals his sentences of life without parole. He contends that the imposition of sentences of life imprisonment without parole was unduly harsh. The defendant argues that the trial justice should not have imposed such excessive sentences (as defendant characterizes them) because (1) he was, at most, vicariously liable for the murders and (2) many mitigating factors were revealed regarding his background. We disagree with defendant's contention that the sentences of life imprisonment without parole were unduly harsh.

We shall first review the basis of the Superior Court's decision to impose sentences of life imprisonment without parole, and we shall then set forth our own independent conclusions as to this sentencing issue.

### 1. The Superior Court's Decision

General Laws 1956 § 11–23–2 [37] allows for the imposition of life imprisonment without parole as a penalty for the commission of murder if any one of seven enumerated circumstances is found to have existed. *See State v. Pacheco,* 763 A.2d 971, 982 (R.I.2001) ("The penalties for murder listed in § 11–23–2 are enumerated in the alternative, thereby requiring that the jury find only one of seven conditions in order to trigger consideration of the 'not eligible for parole' provision."). In such cases, the trial justice must instruct the jury to determine whether one of the circumstances of § 11–23–2 was proven beyond a reasonable doubt. Section 12–19.2–1.

If the jury determines that one of the enumerated circumstances in § 11–23–2 did exist in a particular case, then § 12–19.2–4 requires that at a presentence hearing the court shall "consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination." The court shall, after hearing evidence and arguments concerning the mitigating circumstances relating to the offense, sentence the defendant to life imprisonment without parole, and the

---

36. We have previously held that "extraordinary circumstances" are not present when, on direct appeal, a defendant argues that the trial justice erred in imposing consecutive sentences upon him or when a defendant challenges the criteria that a trial justice used in imposing a sentence. *State v. Hesford,* 900 A.2d 1194, 1198–99 (R.I.2006); *see also State v. Bettencourt,* 723 A.2d 1101, 1114 (R.I. 1999).

37. General Laws 1956 § 11–23–2 provides in relevant part:

"Every person guilty of murder in the first degree: (1) committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed· * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

court must state on the record its reasons for doing so. Section 12–19.2–4.

In the instant case, subsection (1) of § 11–23–2 is implicated; that subsection refers to murders "committed intentionally while [the defendant is] engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed." Consequently, after the jury convicted defendant of all nine counts, the trial justice instructed the jurors to engage in additional deliberations concerning the relevant factor underlying a possible sentence of life imprisonment without the possibility of parole. Ultimately, the jury concluded that the prosecution had proved beyond a reasonable doubt that the murders (counts 8 and 9) were committed intentionally while defendant was engaged in the commission of another capital offense or other felony for which life imprisonment could be imposed.

On August 16, 2004, a presentencing hearing was held in the Superior Court. The state submitted written statements by the families of the victims and an extensive memorandum with supporting documentation concerning defendant's criminal history, his behavior record at the Adult Correctional Institutions (ACI), a presentence report from a prior criminal case, and defendant's mental health records. Defense counsel submitted a similarly extensive memorandum regarding defendant's personal and social background. During the presentencing hearing, Carol Shute, the mother of victim Amy Shute, testified, and the trial justice also heard arguments from both the prosecutor and the defense attorney. The defendant also spoke briefly at this hearing.

After considering all of the evidence and materials before him, the trial justice sentenced defendant to four consecutive life imprisonment sentences without the possibility of parole as a result of the carjacking resulting in death and murder convictions. The trial justice carefully considered all of the information that was presented to him before rendering his decision.

The trial justice first contemplated the severity of the crime, and he concluded that the brutality of the murders alone justified a life sentence without parole. Regarding defendant's background, the trial justice acknowledged that defendant had had a troubled childhood, but he emphasized that defendant possessed "a free will" and "a modicum of intelligence." The trial justice also mentioned the detriment to society that would occur if the bad conduct of people were to be excused merely because they had had a "tough break in life."

Next, the trial justice addressed defendant's potential for rehabilitation. He pointed out that defendant's criminal history (which included participation in two first-degree robberies only a few days before the carjackings and murders of which Jason Burgeson and Amy Shute were the victims),[38] as well as his conduct while incarcerated at the ACI, demonstrated to the trial justice that defendant would most likely engage in further criminal activity if afforded the opportunity. Finally, the trial justice considered the appropriateness of the punishment, explaining that the "barbaric, senseless, merciless, horrific, dehumanizing" nature of the crime justified the sentence. Consequently, the trial justice sentenced defendant to life imprisonment without the possibility of parole.

It is our opinion that the trial justice appropriately considered and weighed the correct factors while formulating defendant's sentence. Therefore, it was entirely within the trial justice's discretion to sen-

---

**38.** *See State v. Day*, 898 A.2d 698 (R.I.2006).

tence defendant to life imprisonment without the possibility of parole.

The defendant argues that he should not have received life imprisonment without the possibility of parole because he was, at most, vicariously liable for the murders. We reject that argument because it is well settled that "where several persons combine or conspire to commit an unlawful act * * * each is criminally responsible for the acts of his [coconspirators] in the furtherance of any prosecution of the common design for which they combine." *State v. Miller*, 52 R.I. 440, 445, 161 A. 222, 225 (1932); see also *State v. Harnois*, 853 A.2d 1249, 1256 (R.I.2004); *State v. Oliveira*, 774 A.2d 893, 918 (R.I. 2001). This is true even if the act "was not a part of the original design or plan, or was even forbidden by one or more of [the conspirators]." *Miller*, 52 R.I. at 445–46, 161 A. at 225; see also *Harnois*, 853 A.2d at 1256; *Oliveira*, 774 A.2d at 918. Consequently, defendant's argument that he cannot be sentenced to life imprisonment without parole because he was only vicariously liable must fail.

The defendant further argues that the various mitigating factors regarding his background that were presented to the trial justice during his presentencing hearing should have precluded the imposition of a sentence of life imprisonment without parole. It is clear from the record that the trial justice did indeed consider these factors, but ultimately decided that, in light of all of the circumstances, defendant should be sentenced to life imprisonment without the possibility of parole. We find no error in his conclusion.

The defendant also argues that the trial justice "gave short shrift" to the sentenc-

ing goals of deterrence and rehabilitation and focused too heavily on the goal of retribution. While the trial justice certainly focused on retribution, it is clear that he did so because of his determination that deterrence and rehabilitation were highly unlikely in this instance. Once again, we cannot fault the trial justice for this determination.

### 2. Our Independent Review

Section 12–19.2–5 provides:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

This Court must exercise independent judgment and discretion in deciding the appropriateness of a sentence of life imprisonment without the possibility of parole. *Pacheco*, 763 A.2d at 981; see also *State v. Tassone*, 749 A.2d 1112, 1119 (R.I. 2000). In other words, this Court will conduct a *de novo* review.[39] *State v. Motyka*, 893 A.2d 267, 288 (R.I.2006). In doing so, we consider the entire record and the trial justice's findings, as well as the "personal character, record, and propensities of the defendant." *Pacheco*, 763 A.2d at 981; *Tassone*, 749 A.2d at 1119.

After conducting our own independent review, see *Motyka*, 893 A.2d at 288, we hold that the sentence of life imprisonment without the possibility of pa-

---

**39.** General Laws 1956 § 12–19.2–5 does not actually use the term *"de novo."* Nonetheless, we have made it clear that, pursuant to our understanding of the statute, "[w]e review a trial justice's decision to impose [a sentence of life without parole] in *de novo* manner." *State v. Motyka*, 893 A.2d 267, 288 (R.I.2006).

role was appropriate. We conclude, as did the jury, that the murders were committed intentionally in the course of another felony. Evidence presented at trial revealed that defendant had participated in the carjacking of Jason and Amy and in the ultimate decision to kill them. We have also critically analyzed "the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant." Section 12–19.2–4. It is our opinion that the manner in which the subject crimes of carjacking and murder were committed—cruel, heartless, inhumane, malicious, savage, and vicious being just a few of the applicable adjectives—alone justifies the imposition of this sentence upon defendant. Moreover, defendant's unfortunate personal history, while a factor to be considered, should not and does not blind us to defendant's troubling character, record, and propensity for criminal activity. There is nothing in the record indicating that defendant has, to this day, shown any real remorse for what he has done, and we note that he apologized to the victims' families only after extensive prodding by the trial justice during the presentencing hearing. Additionally, his previous criminal record clearly demonstrates his tendency to engage in criminal activity even after there have been attempts at rehabilitation.

Accordingly, we hold that the defendant's sentences of life imprisonment without the possibility of parole were appropriate, and we expressly ratify same.

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court in part and we reverse it in part. The record may be remanded to the Superior Court with directions to enter a judgment of acquittal with respect to the defendant's conviction on conspiracy to commit carjacking (count 2) and with respect to the robbery convictions (counts 4 and 5). In all other respects, the judgment of conviction is affirmed.